**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 02:36 PM January 25, 2016**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) CHAPTER 11 |
| | ) |
| JOSEPH J. DETWEILER, | ) CASE NO. 09-63377 |
| | ) |
| Debtor. | ) ADV. NO. 09-6118 |
| _____ | ) |
| | ) JUDGE RUSS KENDIG |
| SEQUATCHIE MOUNTAIN | ) |
| CREDITORS, | ) |
| | ) |
| Plaintiffs, | ) **MEMORANDUM OF OPINION (NOT** |
| v. | ) **INTENDED FOR PUBLICATION)** |
| | ) |
| JOSEPH J. DETWEILER, | ) |
| | ) |
| Defendant. | ) |

This adversary proceeding is before the Court on Joseph Detweiler's ("Debtor") motion for summary judgment. Sequatchie Mountain Creditors ("Plaintiffs[1]") allege in their complaint that Debtor's misrepresentations and fraudulent conduct caused $13,500,000.00 in nondischargeable damages under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). Debtor moves for summary judgment on all of Plaintiffs' claims arguing that Plaintiffs cannot pierce the corporate veil to assert liability and that the debts are dischargeable. Plaintiffs object, arguing that Debtor's own unlawful conduct creates liability, the corporate veil can be pierced, and that the debts are nondischargeable because of Debtor's fraudulent acts.

---

[1] Plaintiffs in this instance and when used throughout the opinion refers to all of the plaintiffs in this adversary proceeding.

1

The Court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## FACTUAL AND PROCEDURAL BACKGROUND

This adversary proceeding arises out of a failed development project known as Sequatchie Pointe. Sequatchie Pointe was a development of over 6,756 acres of land in Marion County, Tennessee, and Dade County, Georgia. The land was to be subdivided and sold as individual undeveloped lots to buyers. The development was to include infrastructure, including water and electric and road access from both Tennessee and Georgia. Additional amenities such as a clubhouse, pool, equestrian center, and riding trails were also planned.

Debtor is the sole owner and director of J.J. Detweiler Enterprises, Inc. ("JJDEI") and Sequatchie Mountain, LLC ("Sequatchie"). Both companies are incorporated under Ohio law. Sequatchie was an LLC created in 2005 specifically to facilitate the Sequatchie Pointe project. As the sole owner of Sequatchie, Detweiler was in charge of the Sequatchie Pointe project, including the hiring and firing of staff, and oversaw both sales and construction.

JJDEI purchased the land for Sequatchie Pointe for $10,809,600.00. The project was financed mainly by ArborOne Enterprises, Inc. ("ArborOne"), which loaned $7,566,721.00, or 70 percent of the total purchase price for the land. The financing involved three agreements between ArborOne and Sequatchie, JJDEI, Wilder Mountain, LLC, and Debtor. The agreements were the following: Term Loan No. 1, Term Loan No. 2, and a revolving line of credit. The first loan was for $5,718,911.00 and also involved the refinancing of outstanding loans owed to ArborOne. The second loan was for the $7,566,721.00 to purchase the land for Sequatchie Pointe. The revolving line of credit was for $5 million.

The conditions of the second loan required ArborOne to be the first lien mortgage and that ArborOne would not make beyond a seventy percent loan to value. The second loan agreement contained a "special release provision." The provision stated that so long as there was no default ArborOne would release the lot for the value it was purchased, which was $1,600.00 per acre, or the most recent appraised value.

Generally, JJDEI projects did not involve the construction of infrastructure. JJDEI's business model was to purchase, sub-divide, and sell undeveloped land. One previous project, Wilder Mountain, involved some infrastructure construction. According to Cheryl McDonald, JJDEI's former executive vice-president and Debtor's daughter, JJDEI typically did not deal with infrastructure construction. Instead, according to Ms. McDonald JJDEI would focus on selling raw land. Russell Phillips, JJDEI's accountant stated regarding Sequatchie Pointe that JJDEI did not have the experience necessary to complete the infrastructure.

In December 2006, ArborOne sent a default notice regarding a breach of the loan agreement requiring the borrowers to maintain a 35 percent owner's equity percentage. The matter was not cured in a timely manner resulting in ArborOne sending a second default notice regarding the owner equity percentage in May 2007. The second letter granted a waiver of the default if the default interest amount of $89,746.03 was paid. Sequatchie paid the default interest amount. ArborOne sent another default letter dated July 27, 2007, regarding the owner equity percentage covenant. ArborOne again offered a waiver, this time on the condition that a fee of 50 basis points was paid. Finally in an ArborOne letter dated January 15, 2009, the loans were declared in default because an installment had not been paid. As a result of payments not being received ArborOne changed the special release provision and required that the entire amount of the purchase price that Sequatchie received for lot sales be paid to ArborOne.

According to Debtor it was always his goal to complete the project. It was not until ArborOne changed the special release provision in 2009 that Debtor knew the Sequatchie Pointe project was never going to be finished. Mr. Phillips agreed that when ArborOne began taking all of the sale proceeds there was not enough money to complete the infrastructure.

Debtor worked with Greg Smith, Vice-President of Sales, to divide and price the lots. According to Mr. Phillips approximately $3.1 million was spent on advertising. Debtor, assisted by Fred and Debbie Fetzner, marketed the lots to potential buyers. Anyone interested was offered a three-day/two-night hotel stay and gift card for travel expenses to visit the property and see the lots available for purchase.

The salespeople did not receive any particular training. According to Debtor the only training was a review of the property restrictions and the purchase prices for the lots. There was also an explanation of the HUD report. According to Matthew Sliger, a Sequatchie salesperson, the customers were generally given a tour on which CB radios would be used to contact the sales office. If the customer wished to purchase a lot they would return to the sales office to review and complete the necessary paperwork.

Included in the paperwork of every Plaintiff was the HUD property report. Plaintiffs also signed a "Receipt, Agent Certification and Cancellation Page," acknowledging that they received the HUD property report. Sequatchie salespeople, including Brandon Oliver and Lucas Alonso, stated that they reviewed the HUD report with every customer. Mr. Oliver explained that the HUD report was read to each purchaser page by page, and that it contained a number of disclaimers regarding the completion of the amenities that could scare off a sale.

Ian Hearn, another Sequatchie salesperson, and Mr. Sliger, stated that the sales staff provided customers with time frames for the completion of amenities, but not dates certain. Further, Mr. Alonso, Mr. Sliger, and Mr. Hearn stated that they were never intending to mislead potential purchasers nor was there a scheme to mislead buyers.

Dan Graber, the Sequatchie Pointe project manager, in his deposition testified that one of the sales practices in use at Sequatchie Pointe involved using CB radios to call out the fake sales in order to put pressure on buyers to purchase before the lots were gone. He also stated that Debtor told him to use the heavy machinery for construction projects when prospective buyers

were visiting in order to make it appear as if progress was happening on the development. Another sales practice that was used according to Mr. Graber was to show buyers a lot outside their price point, one below their price point, and one in their price point.

According to Mr. Graber the project was cash strapped from the outset and he had to beg for money in order to get any of the construction completed. Additionally, the timelines for completing the amenities and roads told to buyers by salespeople were misleading because there was not enough money to complete them. It was Debtor, according to Mr. Graber, who told the salespeople to continue telling potential buyers that the amenities would be completed by dates certain.

Ervin Moore, another Sequatchie Salesperson, recounted that during a meeting Mr. Graber told the sales force to tell potential buyers whatever they wanted to hear in order to close a sale. He stated that Mr. Graber told them to mislead customers regarding the amenities. According to Mr. Moore, it was Mr. Graber and not Debtor that told other sales people to mislead customers.

Certain plaintiffs in this case testified at their depositions that they were told by Sequatchie salespeople that the amenities would be completed. They also stated that roads and other infrastructure would be completed by certain dates. Plaintiffs differ regarding the exact dates they were told but most were within a year of when they purchased their properties. According to the plaintiffs who provided testimony, the infrastructure and the amenities were in large part why they purchased a lot at Sequatchie Pointe.

Around the same time as the Sequatchie Pointe development, JJDEI was also investing in a dairy farm. Both Debtor and Ms. McDonald confirm that millions of dollars were invested in a dairy farm by JJDEI. Ms. McDonald also believes that the dairy farm was a contributing factor in the failure to complete the Sequatchie Pointe project. Mr. Graber also believes that Sequatchie Pointe failed in part because of the money JJDEI put toward the dairy farm. According to Mr. Phillips, JJDEI's accountant, none of the lot purchase money was used for the dairy farm. Debtor also had a personal car collection that he spent approximately $300,000 on from 2006-2009.

It is the Debtor's contention that the failure of Sequatchie Pointe was due to the following three reasons: 1) the recession, 2) ArborOne's decision changing the special release provision resulting in no longer having the necessary funds to complete the project, and 3) the roads and other construction obstacles costing more than expected. It is the Plaintiffs contention that Debtor knew from the outset that the project was underfunded and continued to mislead buyers into purchasing lots with the promise of amenities, and that Debtor used the funds from lot sales for his own personal gain.

Debtor filed his chapter 11 bankruptcy petition on August 17, 2009. On October 19, 2009, Plaintiffs filed an adversary complaint. Plaintiffs claim that Debtor induced them to purchase land at Sequatchie Point through fraud and misrepresentation resulting in a total of $13,500,000.00 in nondischargeable damages. On December 29, 2009, Debtor filed his answer. Debtor filed a motion for summary judgment on May 29, 2015. On August 12, 2015, Plaintiffs

filed their response.  On September 18, 2015, Debtor filed a reply brief.  On October 13, 2015, Plaintiffs with leave of the Court filed their sur-reply.

**LAW AND ANALYSIS**

    **I.**    **Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (incorporating Federal Rule of Civil Procedure 56 into the bankruptcy rules). In making this determination, the court must view the evidence in a light most favorable to the nonmoving party. Matsushita Elec Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 596-88 (1986).  The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 371, 323 (1986).

Once the moving party has established their initial burden, the opposing party may not rest on mere allegations or denials contained in the party's pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. Id. Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. Id.

However, a court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claims." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir.1989). Instead, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties. See Poss v. Morris (In re Morris), 260 F.3d 654, 665 (6th Cir. 2001); Fed.R.Civ.P. 56(c).

Plaintiffs, as the party contesting the dischargeability of a debt, have the burden of proving the elements of the relevant exception by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287 (1991).

    **II.**    **Choice of Law**

    **a.**  **Tennessee or Ohio Law**

The parties dispute whether Ohio or Tennessee law applies to the state law issues in this case. Although, as the Sixth Circuit Court of Appeals recognized in In re Dow Corning, 419 F.3d 543, 548 (6th Cir. 2005), there is a circuit split regarding whether a bankruptcy court should use federal choice-of-law principles versus the forum state's choice-of-law principles, both federal common law and Ohio law result in the application of the Restatement (Second) of Conflicts of

5

Law.  Constr. Data Sols., LLC v. Grant (In re Grant), No. 12-3205, 2015 WL 1517778, *12 (Bankr. N.D. Ohio March 30, 2015) (citing Med. Mut. of Ohio v. De Sota, 245 F.3d 561, 570 (6th Cir. 2001) (adopting Restatement (Second) of conflicts of Law under federal common law); Morgan v. Biro Mfg. Co., 474 N.E.2d 286, 288 (Ohio 1984) (adopting Restatement (Second) of Conflicts of Law under Ohio law)).

The issues in this case involve matters of fraud, misrepresentation, agency, and shareholder liability arising under state law. In actions involving fraud or misrepresentation Restatement (Second) Conflicts of Law § 148 (Am. Law Inst. 1971) governs, it states:

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Id.  Almost all of the allegations of fraud and misrepresentations from the Plaintiffs took place in Tennessee.  The sales were conducted in Tennessee, with buyers traveling to Sequatchie Pointe, taken on a tour and often signing the purchase agreements while at Sequatchie Pointe.  Plaintiffs' allegations are that Debtor or his agents made fraudulent representations that induced the buyers to purchase lots during these sales trips.  Accordingly, Tennessee law controls the fraud claims.

The Restatement (Second) Conflicts of Law § 291 governs conflict of laws for agency, it states:

> The rights and duties of a principal and agent toward each other are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6.

Id. In this case, the state with the most significant relationship to the party's transaction is Tennessee.  The vast majority of the project took place in Tennessee, the majority of the construction was in Tennessee, and the sales took place primarily in Tennessee.  Therefore, the Court will apply Tennessee agency law.

The Restatement (Second) Conflicts of Law § 307 governs conflict of laws regarding shareholder liability, it states:

> The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts.

6

Here, the transaction were between the Plaintiffs, Sequatchie and JJDEI. Sequatchie was incorporated as an Ohio limited liability company. JJDEI is an Ohio corporation. Accordingly, Ohio state law will be applied to any issues regarding piercing the corporate veil of Sequatchie's shareholders.

      **b. Whether Denial of Summary Judgment is a Remedy for Citing Incorrect Law.**

Plaintiffs argue that summary judgment should be denied for Debtor's citation to Ohio law only in his motion for summary judgment. Plaintiffs rely on Logan Farms v. HBH, Inc., 282 F. Supp. 2d 776 (S.D. Ohio 2003) and Lyon v. Yellow Transp., Inc., No. 2:08-CV-464, 2009 WL 1604807 (S.D. Ohio June 8, 2009) to support their argument. These cases involved motions that were unsupported by law entirely. Here, Debtor has supported his motion with law.

Plaintiffs claim that Tennessee law is controlling and thus Debtor's reliance on Ohio law is grounds for denial of summary judgment. However, as the parties concede there fundamentally is not a conflict between the Tennessee and Ohio law regarding the issues in this case. Because there is not a material difference between the law of Tennessee and Ohio Debtor's choice to only cite Ohio law in his original brief is not grounds for denying the summary judgment motion. Accordingly, Debtor did not fail to support his motion with proper legal authority as the Plaintiffs suggest and summary judgment will not be denied on those grounds.

### III.    Admissible Evidence under Fed. R. Civ. P. 56(c)(2)

Plaintiffs object to evidence used by the Debtor as support for his motion for summary judgment. Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "Courts have recognized that the objection contemplated under Rule 56 is not that the material has not been submitted in admissible form, but that it *cannot* be." In re Fremont Hospitality Group, LLC, No. 13-31005, 2014 WL 479668 at *5 (Bankr. N.D. Ohio Sept. 26, 2014) (citing Martin v. Performance Boat Brokerage.com, LLC, 973 F. Supp. 2d 820, 824 (W.D. Tenn. 2013); Harden v. AlliedBarton Sec. Serv., No. 3:10–00779, 2013 WL 2467714, at *8 (M.D. Tenn. June 7, 2013); Brown v. Siemens Healthcare Diagnostics, Inc., No. DKC 11–0769, 2012 WL 3136457 at *5 (D.Md. July 31, 2012)). Plaintiffs raise eight objections to evidence presented or relied upon by Debtor in his summary judgment motion.

Plaintiffs' first objection is to testimony from Mr. Phillips and Sequatchie Pointe salespersons regarding Debtor's intention to complete the development. Plaintiffs argue that this is impermissible as the witnesses do not have personal knowledge or are giving improper opinion testimony. Fed. R. Evid. 602 & 701. Additionally, Plaintiffs argue that these statements are hearsay and do not fit under the exception for then existing mental, emotional, or physical conditions. Fed. R. Evid. 803(3).

Rule 602 requires that a witness have personal knowledge of the matter in order to testify, unless they are an expert witness. These witnesses do not appear to have personal knowledge of Debtor's intentions. Instead they appear to be expressing their own view of whether the Debtor intended to finish Sequatchie Pointe. Regarding hearsay, Rule 803(3) states that the following is not excluded by the rule against hearsay, "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)…." Id. This testimony does not fit into this exception as the salespeople and Mr. Phillips are testifying regarding their belief that Debtor intended to complete the project. In this form these statements from the salespeople and Mr. Phillips appear to lack personal knowledge and/or do not fit within a hearsay exception. Plaintiffs' first objection is sustained. Although, through these witnesses the evidence cannot be submitted in an admissible form Debtor's own testimony was that he intended to complete the project. Thus, for the purposes of summary judgment the court may consider this fact.

Plaintiffs' second objection is to Debtor's introduction of testimony from lay witnesses regarding the impact the "Great Recession" had on the Sequatchie Point project. Plaintiffs argue that an expert is required to testify regarding the economy and its effect on Sequatchie Mountain. Fed. R. Evid. 701; see State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc., 925 F. Supp. 1247, 1252 (S.D. Ohio 1996). Debtor argues that the "Great Recession" is a fact or part of history that is common knowledge and therefore expert opinion is not necessary to testify to the impact that it had on businesses. See Laurel Valley Oil Co. v. McIntosh Oil Co. (In re Laural Valley Oil Co.), No. 05-64330, Adv. No. 12-6014, 2015 WL 4555579 (Bankr. N.D. Ohio July 28, 2015)(citing Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir. 1994)).

Plaintiff's argument is well taken, although it is common knowledge that there was a "Great Recession" starting in 2007, the impact it had on businesses or Sequatchie Mountain in specific is opinion testimony that is the province of experts. See Louis Trauth Dairy, Inc., 925 F. Supp. at 1252. Debtor and the Sequatchie staff may have some personal knowledge regarding difficulties of sales at the Sequatchie Pointe project and can certainly express that knowledge, but may not provide opinions regarding the economy's role in causing Sequatchie Pointe's failure.

Plaintiffs' third objection is to the use of Mr. Phillips testimony regarding the financial records of Debtor. Plaintiffs object because Mr. Phillips is not an expert and thus cannot testify regarding these financial documents. See Fed. R. Evid. 701. Debtor counters that Mr. Phillips is a "summary witness" not an expert, whose testimony can be admissible. Furr's Supermarkets, Inc. v. Conagra Grocery Products Co. and Conaga Foods, Inc. (In re Furr's Supermarket, Inc.), 373 B.R. 691, 703 (B.A.P. 10th Cir. 2007). "A 'summary witness' is an example of a personal knowledge problem associated with hearsay that is given special treatment by the courts. Id. The term 'summary witness' may be used in various contexts, but is most often a reference to a witness who is called to testify as to voluminous data compiled by others under his or her supervision." Id. at 704. Again, the standard on summary judgment is whether the evidence cannot be presented in admissible form. Mr. Phillips is testifying from both personal knowledge and as a summary witness and as such his testimony regarding financial matters will be allowed. The objection is overruled.

Plaintiffs' fourth objection is overruled. Plaintiffs object to attorney Scott Zurakowski's affidavit as it violates the ban on counsel acting as both attorney and witness. Ohio Rule Professional Conduct 3.7. Counsel is not in violation of this ban as he has not testified in this matter. Further, the statements in the affidavit regarding certain Plaintiffs being deceased or not deposed yet is admissible in other forms. Lastly, Rule 56 no longer requires an authentication of documents in support of summary judgment and as such the rest of his affidavit is moot. Ice House Am., LLC v. Cardin (In re Cardin), No. 11-52077, Adv. No. 11-5077, 2013 WL 1092118, *3 (Bankr. E.D. Tenn. Jan. 31, 2013). The statements in the affidavit are admissible in other forms or moot and thus the objection is overruled.

Plaintiffs' fifth objection is overruled. Plaintiffs object to testimony concerning Defendant's personal and business assets as it is hearsay under Rules 801-807. The objection is vague, Plaintiff fails to even explain whose testimony they are objecting to. Further, testimony regarding Debtor's assets could easily be introduced through the Debtor himself and not be hearsay.

Plaintiffs' sixth objection is regarding Mr. Phillips's testimony regarding an analysis he conducted of the Chattanooga real estate market. The objection is overruled. The testimony is based on the witness's personal knowledge. Additionally, even if the testimony ventured into the realm of expert testimony it could still be admissible into evidence through a qualified expert witness.

Plaintiffs' seventh objection is to Debtor's testimony in paragraphs 3-6 of his affidavit. Plaintiffs argue that the statements are hearsay and violate Fed. R. Evid. 1006 because referenced documents are not included. The standard is whether this evidence cannot be introduced in admissible form. In re Fremont, 2014 WL 479668 at *5. This evidence clearly can be introduced in some form. Debtor could simply testify to the facts in these paragraphs. Further, the paragraphs do not specifically mention the contents of any documents and even if they did Plaintiffs provide no support as to why these documents would be inadmissible. Consequently, the court overrules this objection and can consider the statements in these paragraphs.

Plaintiffs' eighth objection is to testimony concerning the financial records by Mr. Phillips as the documents are inadmissible hearsay because they have not been properly authenticated by the records custodian. Fed. R. Evid. 803(6). A document is admissible as a business record under Rule 803(6) if it meets the following four requirements:

> (1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

Id. Although a business record could be hearsay, the standard for a 56(c)(2) objection is not whether the evidence is currently in an admissible form but whether it cannot ever be admissible.

9

In re Fremont, 2014 WL 479668 at *5.  Plaintiffs are arguing that the records are inadmissible currently, not that they could never be authenticated by a records custodian.  Accordingly, the objection is overruled.

Plaintiffs assert that if their objections to improper evidence are granted Debtor has failed to satisfy his burden of showing that summary judgment is appropriate.  As explained previously the majority of the evidence Plaintiffs object to can be introduced in admissible form and therefore can be considered by the Court regarding this motion. Further, even after the Court excludes the improperly introduced evidence Debtor has presented copious other relevant and admissible evidence supporting his claims that summary judgment should be granted regarding all of Plaintiffs claims.  Therefore, summary judgment will not be denied because Debtor has failed to satisfy his burden.

### IV. Summary Judgment for Unresponsive and Deceased Plaintiffs

#### a. Plaintiffs Unavailable for Deposition

Debtor, specifically, moved for summary judgment for the following plaintiffs: Dennis Walton, William King, Manuel Real, Joyce Renz, Gene Renz, and Ana Rodriguez, because they he was unable to take their depositions.  However, Debtor provided no legal support for this position. The only authority Debtor provided was a non-binding state court case from Ohio that held that a party denied summary judgment because of a lack of depositions must show prejudice. Patterson v. Boland, No. 90-CA-44, 1990 WL 212654, *2 (Ohio Ct. App. Dec. 28, 1990). Although, it may be inconvenient to not have deposed all of the Plaintiffs Debtor has not proven how it has prejudiced his defense or results in the non-deposed plaintiff's claims failing as a matter of law. Accordingly, summary judgment will not be granted on the basis of failure to depose certain Plaintiffs.

#### b. Plaintiff Wesley Jinks

The next issue the court will consider is whether summary judgment is appropriate regarding Wesley Jinks's claims as he failed to respond to the motion. Plaintiff, Wesley Jinks, is represented by a different attorney than the remaining plaintiffs.  Debtor in his summary judgment motion presented ample evidence establishing that he is entitled to judgment as a matter of law regarding the dischargeability of the debts.  Accordingly, Debtor has satisfied his initial burden regarding Mr. Jinks.  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Bell v. IRS (In re Bell), 181 B.R. 311, 315 (N.D. Ohio 1995) (citing Matsushita, 475 U.S. at 586).  Mr. Jinks, in failing to respond, has failed to present any evidence that regarding his claims there are issues of material fact requiring a trial.  Accordingly, summary judgment is granted regarding Mr. Jinks' claims.

### c. Deceased Plaintiffs

Debtor argues that summary judgment should be granted with respect to plaintiffs Mary Czajika and John Hallman claims as they are now deceased. Federal Rule of Civil Procedure 25 controls substation of claims because of the death of a party. It states the following:

> **Substitution if the Claim Is Not Extinguished**. If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a)(1).

Mr. Hallman's estate has been substituted for him in this matter. However, Mary Czajka is still listed as a Plaintiff and there was never an attempt to substitute her estate. Accordingly, summary judgment is granted on Mary Czaijka's claims.

### V. Summary Judgment for Plaintiffs Failure to Individually Prove Claims.

Plaintiffs have not filed a class action in this court. Therefore, although Plaintiffs may allege similar conduct on the part of the Debtor, each Plaintiff's case is considered independently. Once the Debtor, as the moving party, satisfies his burden that no material facts exist the Plaintiffs must present evidence regarding each one of their claims in order to survive summary judgment. See Anderson, 477 U.S. at 256. As previously discussed, Debtor met his initial burden. Plaintiffs need to introduce evidence that sustains an issue of fact for each of their claims. The following Plaintiffs have failed to introduce any evidence in their favor: Estate of John Hallman, Ana Rodriguez, William King, Wesley Jinks, Manuel Real, Gene Renz, and Joyce Renz. Therefore, absent an issue of material fact summary judgment is granted regarding all of Ana Rodriguez, William King, Wesley Jinks, Manuel Real, Gene Renz, Joyce Rence, and the Estate of John Hallman's claims.

Plaintiffs argue that the Court cannot consider this argument from the Debtor because it was raised for the first time in their reply brief. Eng'g & Mfg. Servs., LLC v. Ashton, 387 F. App'x 575, 583 (6th Cir. 2010). Plaintiffs argue that raising new arguments in a reply brief is in violation of Rule 56 and cannot be considered because the nonmoving party did not receive notice of these arguments through the initial briefing. Id. Plaintiffs' argument fails for two reasons. In Eng'g & Mfg. Servs., LLC the Sixth Circuit held that not allowing the nonmoving party a chance to respond to new allegations was an error. Id. Guaranteeing the nonmoving party a chance to respond through a sur-reply. Here, Plaintiffs were given a chance to respond and thus there is no violation of Rule 56. Second, and more importantly, Debtor has not raised new facts or a new argument. In Debtor's initial briefing they raised the issue that summary judgment should be granted on all of Plaintiffs' claims and presented evidence satisfying their initial burden. Then in their reply brief they brought attention to the fact that the majority of

11

Plaintiffs had not presented any evidence that would create an issue of material fact. This is not a new argument.

### VI. Piercing Sequatchie Mountain, LLC's Corporate Veil

Debtor argues that Plaintiffs cannot pierce Sequatchie's corporate veil and hold him personally liable for any of the alleged injuries. "It is a fundamental rule of corporate law that shareholders, officers, and directors are not generally liable for the debts of the corporation." Mayher v. Ma (In re Ma), 375 B.R. 387, 393 (Bankr. N.D. Ohio 2007) (quoting Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., 617 N.E.2d 1075, 1085 (Ohio 1993)). "Unless the corporate veil is pierced, general corporate law principles shield officers and directors, like the Debtor, from personal liability for the debts or actions of the separate corporate entity." Cash Am. Fin Servs., Inc. v. Fox (In re Fox), 370 B.R. 104, 113 (B.A.P. 6th Cir. 2007)(citations omitted). As previously discussed Ohio law governs any individual shareholder liability issues regarding Sequatchie. Under Ohio law the corporate form may be pierced and individual shareholders held liable for corporate maleficence when:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

Belvedere, 617 N.E.2d at 1086. The first element is a restatement of the alter-ego doctrine, which requires that a plaintiff "show that the individual and the corporation are fundamentally indistinguishable." Id. In determining whether the first element is satisfied, Ohio courts consider the following:

> (1) grossly inadequate capitalization, (2) failure to observe the corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporate was a mere façade for the operations of the dominant shareholder(s).

S. Atl. Neurology and Pain Clinic, P.C. v. Lupo (In re Lupo), 353 B.R. 534, 542. (Bankr. N.D. Ohio 2006)(citations omitted). Although these factors are to be considered, "because of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive." Carter–Jones Lumber Co. v. LTV Steel Co., 237 F.3d 745, 749 (6th Cir.2001) (applying Ohio law). A corporation having one shareholder does not, without additional evidence, mean that the shareholder exercised complete control over the corporation. "A corporation is a separate legal entity from its shareholder even where there is only one shareholder in the corporation." Zimmerman v. Eagle Mtge. Corp., 675 N.E.2d 480 485 (Ohio Ct. App. 1996).

09-06118-rk    Doc 246    FILED 01/25/16    ENTERED 01/25/16 14:39:08    Page 12 of 19

Here, Debtor was the only shareholder of both JJDEI and Sequatchie. Plaintiffs have presented no evidence that the Sequatchie was not adequately capitalized, that the corporate formalities were not observed, that the company was insolvent when Sequatchie Pointes was started, that there were no corporate records, or that it was a façade for Debtor's own personal use. Therefore, other than their assertions to the contrary, Plaintiffs have failed to provide any evidence that Debtor exercised such complete control over the corporation that the corporate form should be ignored. Because the test is not satisfied the corporate veil cannot be pierced.

## VII. Debtor's Individual Liability

Plaintiffs claim that Debtor should be held individually liable for the debts occurring from the failure to develop Sequatchie Mountain. Plaintiffs argue that Debtor can be held liable for his own unlawful actions and the actions of his agents. Under both Ohio and Tennessee law officers can be held liable for their own tortious conduct and the conduct of their agents. Kodz v. Trotter (In re Trotter), No. 312-00612, Adv. No. 312-90232, 2013 WL 3013339, *4 (Bankr. M.D. Tenn. June 17, 2013); Yo-Can, Inc. v. The Yogurt Exchange, Inc., 778 N.E.2d 80, 91 (Ohio Ct. App. 2002); Brungard v. Caprice Records, Inc., 608 S.W.2d 585, 590-91 (Tenn. Ct. App. 1980). Therefore, the Court will examine whether Plaintiffs have presented significant facts to show some tortious activity on the part of the Debtor or by his agents.

### a. Benefits Theory

The first issue is whether the benefit theory applies to claims regarding Debtor's personal liability. The "benefits theory" focuses on whether a debtor "must personally receive money or services as the result of a false representation in order for the § 523(a)(2)(A) exception to apply." Ash v. Hahn (In re Hahn), No. 11-32001, Adv. No. 11-3146, 2012 WL 392867, at *4 (Bankr. N.D. Ohio Feb. 6, 2012). The Sixth Circuit Court has adopted this theory. Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172 (6th Cir. 1996); Thorton v. Armstrong (In re Armstrong), Adv. No. 06-3063, 2008 WL 4059891, *2 (Bankr. N.D. Ohio Aug. 26, 2008). The Sixth Circuit held that a creditor must show some direct or indirect tangible or intangible financial benefit to the debtor in order to prevail under § 523(a)(2)(A). Brady, 101 F.3d at 1172. In Brady, the plaintiff creditor successfully proved that the debtor benefited when a corporation he controlled received $40,000 from the creditor. Id.

Plaintiffs, relying on Lowry v. Nicodeumus (In re Nicodemus), 497 B.R. 852 (B.A.P. 6th Cir. 2013), claim that the Sixth Circuit has not adopted the benefits theory. Plaintiffs are mistaken as In re Nicodemus does not involve the "benefits theory" at all. Id. Instead in In re Nicodemus, the Bankruptcy Appellate Panel determined that a contempt judgment entered against a Chapter 13 debtor was nondischargeable. Accordingly, in order for § 523(a)(2)(A) exception to dischargeability to apply Debtor must have received some benefit.

Here, Plaintiffs have presented sufficient facts to show that Debtor has benefited from the Sequatchie Pointe transactions with Plaintiffs. Debtor was the sole owner of both JJDEI and Sequatchie. Debtor also had personally guaranteed some of the ArborOne loans for Sequatchie Pointe. According to Debtor's accountant, Mr. Phillips, $4,394,700.00 of the purchase payments went to JJDEI, another $2,035,532.43 went to ArborOne, and a small amount of $750.00 went

13

directly to Debtor to pay a tax bill. Plaintiffs have introduced evidence of both direct benefits to the Debtor and indirect benefits through his company. Therefore, the "benefits theory" will not preclude the Court from considering whether the Debt is dischargeable under § 523(a)(2)(A).

### b. Debtor's Individual Liability for Tortious Conduct or Acts of Agents

The next issue the Court will examine is whether Debtor's own conduct or the conduct of his agents can create personal liability. Tennessee law applies to the tort and agency issues in this case. Under Tennessee law, an officer or director of a corporation can be personally liable for committing or participating in the commission of tortious conduct. Brungard, 608 S.W.2d at 590-91.

Under Tennessee agency law a debtor can be personally liable for any fraudulent misrepresentations made by his sales representatives. In re Trotter, 2013 WL 3013339 at *4. "An agency relationship does not require an explicit agreement, contract, or understanding between the parties." White v. Revco Discount Drug Centers, Inc., 33 S.W.3d 713, 723 (Tenn. 2000). A principle may be held liable for an agent's tortious conduct even without directing or having knowledge of the conduct so long as the "agent was acting in the business of his superior." Id. at 724 (quoting Kinnard v. Rock City Const. Co., 286 S.W2d 352, 354 (Tenn. 1955)). Here, the parties do not dispute that the salesforce were acting as Debtor's agents.

Plaintiffs have introduced sufficient evidence showing material issues of fact regarding whether Debtor is personally liable for his own actions or those of his agents. According to Mr. Graber, Debtor represented that the amenities would be completed at certain times. Further, Mr. Graber stated that Debtor would tell his salespeople to use the bond date when informing the buyer when amenities would be completed. Mr. Graber also explained that Debtor knew that when he was giving these instructions that they were not accurate as the financing for the project was making these completion dates impossible. All of the Plaintiffs who did provide testimony stated that they were told by Sequatchie salespeople that the amenities would be completed by certain dates or soon. At a minimum Plaintiffs have raised sufficient issues of fact that Debtor knowingly had his agents misrepresent facts in order to sell lots. Therefore, Plaintiffs as the nonmoving party have presented sufficient facts that Debtor's personal liability an issue for trial.

### VIII. Nondischargeability under 11 U.S.C. § 523(a)(2)(A)

Plaintiffs seek to have the debts declared nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. Plaintiffs claim that Debtor personally or through his agents made fraudulent misrepresentations that were intended to deceive Plaintiffs into purchasing lots.

Section 523(a)(2)(A) of the Code renders nondischargeable any debt "for money, property, services . . . obtained by false pretenses, a false representation, or actual fraud." As outlined by the Sixth Circuit, before a debt will fall under the discharge exception of § 523(a)(2)(A), the following elements must be shown:

(1) the debtor obtained money or services through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
(2) the debtor intended to deceive the creditor;
(3) the creditor justifiably relied on the false representation; and
(4) its reliance was the proximate cause of loss

Ohio Dep't Job & Family Servs. v. Urbina (In re Urbina), 519 B.R. 694, 698 (Bankr. N.D. Ohio 2014) (citing Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 281–82 (6th Cir. 1998)). Important to a § 523(a)(2)(A) claim is the debtor's intent to deceive, which is broadly defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). The Supreme Court has determined that the justifiable reliance standard that Congress intended to adopt for purposes of § 523(a)(2)(A) was the common law understanding of justifiable reliance as articulated by the Restatement (Second) of Torts. Field v. Mans, 516 U.S. 59, 71 (1995). According to that standard justifiable reliance "'is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which would serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" Id. (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).

Plaintiffs argue that Debtor or his agents made material misrepresentations regarding the amenities and infrastructure in order to sell lots at Sequatchie Pointe. Debtor claims that there were no misrepresentations and that the HUD property report's disclaimers regarding the funding for amenities would preclude anyone from relying on anything to the contrary.

There are issues of material fact for trial regarding Plaintiffs' claims under 11 U.S.C. § 523(a)(2)(A). Through Mr. Graber's testimony Plaintiffs have presented sufficient evidence that supports their claim that Debtor knew of the financial issues facing Sequatchie Pointe while his salesforce was telling purchasers that the amenities would be completed by dates certain. Mr. Moore also stated that Mr. Graber told the salesforce to make these misrepresentations. A number of the Plaintiffs confirmed that they were told that the infrastructure and amenities would be completed by certain dates.[2] According to these Plaintiffs the lots were purchased in reliance on these statements regarding the completion of amenities and infrastructure. On the other hand,

---

[2] The Plaintiffs mentioned here are the following: Catherine Walton, Dennis Walton, Denise Voyles, Anthony Voyles, Constance Van Doren, William Van Doren, Deborah Valvo, Michael Valvo, Susan Stone, George Stone, Dianne Schmid, Joseph Schmid, Gayne Meadows-Roberts, Robert Roberts, Flora Rela, Federico Pratts, Elida Perez, Julio Perez, Lana Meschino, Paul Meschino, Mary Olivas, Frank Meier, Ellen McAvoy, Charles McAvoy, Sharyn Roettger, Stan Malecki, Irmgard Lisi, Ronald Kroll, Diana King, Baeley Jaikaran, Katie Hoehn, Ryan Hoehn, Bonnie Hill, Robert Hill, Fred Hearn, Donna Hauser, Richard Hauser, Wanda Crowell, Julius Harris, Shirley Hallman, Diana Graham, Thomas Graham, Gay Glassman, Deborah Friske, Robert Friske, Carol Ferkinoff, Marvin Ferkinoff, Richard Czajka, Mary Lou Constant, Robert Constant, Christine Clewes, Carol Charland, William Charland, Diane Beaudoin, Daniel Beaudoin, Lisa Allen, Robert Allen, Mary Alice Agusta, Vincent Agusta. As previously discussed, because this case is not a class action, each Plaintiff must introduce evidence supporting their claims. Summary judgment was granted regarding those Plaintiffs that did not present evidence supporting their claims in section V.

the HUD report, which was shown to every purchaser, contains a number of disclaimers contradicting Plaintiffs testimony. Specifically, the report includes disclaimers about the funding for roads and amenities. A number of the Sequatchie salespeople also stated that they never misrepresented that the amenities would be completed by dates certain. However, considering the HUD report and the statements of the Sequatchie salespeople, viewing the evidence in the favor of Plaintiffs, as the nonmoving party, there is sufficient evidence to show issues of material fact regarding claims of nondischargeability under § 523(a)(2)(A). Accordingly, Debtor's motion for summary judgment is denied for these Plaintiffs claims.

### IX. Nondischargeability under 11 U.S.C. § 523(a)(4)

Plaintiffs claim that the debt is nondischargeable under the embezzlement and larceny theories of § 523(a)(4). Under 11 U.S.C. § 523(a)(4) a debtor is not entitled to a discharge for any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Plaintiffs argue that Debtor is not entitled to a discharged because he committed embezzlement and larceny regarding the funds paid by Plaintiffs to purchase lots at Sequatchie Pointe.

"Embezzlement under section 523(a)(4) is the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." In re Brady, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (quoting Gribble v. Carlton (In re Carlton), 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982)). A creditor seeking to establish a claim for embezzlement under § 523(a)(4) must show the following elements: (1) the creditor entrusted the property to the debtor, (2) the debtor misappropriated the property for a non-intended use, and (3) there are indicators of fraud." Ball v. McDowell (In re McDowell), 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993). Larceny for the purposes of § 523(a)(4) is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." Meade v. Pinkerman (In re Alwood), 531 B.R. 182, 189 (Bankr. N.D. Ohio 2015). "In short, § 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement." 4 Collier on Bankruptcy, ¶ 523.10[2] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013).

Plaintiffs' claims of embezzlement require evidence that they entrusted their funds to Debtor for the purpose of completing the development. In re Brady, 101 F.3d at 1173 ("A creditor proves embezzlement by showing that he entrusted his property to the debtor."); Reshetar Systems, Inc. v. Thompson (In re Thompson), 686 F.3d 940, 947 (8th Cir. 2012). Plaintiffs assert in their brief that they entrusted Debtor with their money only to develop Sequatchie Pointe. However, Plaintiffs have provided no evidence to support that assertion that they entrusted their money to Debtor and that it was only to be used for Sequatchie Pointe. Instead, the evidence provided shows contracts between the Plaintiffs and Sequatchie to purchase land with the promise of certain infrastructure and amenities. There is no evidence that the funds were entrusted to Sequatchie only be used to develop Sequatchie Pointe. Thus, Sequatchie was allowed to determine how to best use the funds from lot sales.

16

Additionally, as a contract for the purchase of land, once Plaintiffs paid the sale price and were provided with the title and future promises of amenities, the funds were no longer their property. Instead the funds become the property of Sequatchie. Teamsters Local 533 v. Schultz (In re Schultz), 46 B.R. 880, 889-90 (Bankr. D. Nev. 1985). "One cannot embezzle one's own property." In re Thompson, 686 F.3d at 947. Because the funds were Sequatchie's and not Plaintiffs' there is no embezzlement. At most, the failure to complete the infrastructure and amenities makes Plaintiffs' claims dischargeable breaches of contract, not nondischargeable embezzlement. Id. Accordingly, Plaintiffs have not presented any evidence that satisfies the first element of a claim for embezzlement under § 523(a)(4).

Plaintiffs are also unable to support their claims of larceny. Plaintiffs purchased lots from Sequatchie pursuant to purchase agreements entered into between Plaintiffs and Sequatchie. There is no evidence that Debtor unlawfully took property from the Plaintiffs without their consent. See Hamerly v. Salupo (In re Salupo), 386 B.R. 659, 669 (Bankr. N.D. Ohio 2008). In Salupo, the court held that showing larceny was not possible when the parties contracted to build a house under a purchase agreement. Id. Here, the parties also consented to the purchase of the undeveloped land. Although the amenities were never completed that does not prove that Debtor committed larceny. Accordingly, summary judgment is granted for Plaintiffs claims of nondischargeability under § 523(a)(4).

## X. Non-Dischargeability under 11 U.S.C. § 523(a)(6)

Plaintiffs also seek a determination that the debts are nondischargeable under §523(a)(6) of the Bankruptcy code. A debt is excluded from discharge under § 523(a)(6) if the debt is "for willful and malicious injury by the debtor to another entity or to the property of another entity." Id. Plaintiffs seeking to have a debt discharged under § 523(a)(6) must prove "by a preponderance of the evidence that the injury from which the debt arises was both willful and malicious." Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 463 (6th Cir. 1999). "Only acts done with the intent to cause injury – and not merely acts done intentionally – can cause willful and malicious injury." Id. at 464; Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998). For an injury to be willful the debtor must desire to cause the consequences of his actions, or believe the consequences are substantially certain to result from it. In re Markowitz, 190 F.3d at 463 (citing Restatement (Second) of Torts § 8A, at 15 (1964)). A malicious injury is one caused in "conscious disregard of one's duties or with just cause or excuse." Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986).

Plaintiffs have failed to present evidence that it was the Debtor's intent to cause an injury to the Plaintiffs. Plaintiffs argue that Debtor knew the development was going to fail and sold lots to Plaintiffs anyway. Plaintiffs, however, do not present any evidence that Debtor knew, or intended to defraud the Plaintiffs from the beginning of the project. Nor is there any evidence that Debtor desired to cause Plaintiffs to purchase lots without receiving anything in return. Instead, Debtor has introduced evidence that he attempted to complete the project until it was no longer feasible. There is no evidence that Debtor intended or desired to injure the plaintiffs. Accordingly, summary judgment is granted on all of Plaintiffs claims for nondischargeability under § 523(a)(6).

17

## CONCLUSION

Debtor's motion for summary judgment is **GRANTED** regarding all of Plaintiffs' claims that the debt is nondischargeable under 11 U.S.C. § 523(a)(4) and (a)(6). Further, the Court **GRANTS** summary judgment on Plaintiffs Wesley Jinks, Mary Czajka, Ana Rodriguez, William King, Manuel Real, Gene Renz, Joyce Rence, and the Estate of John Hallman's claim that the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A). Debtor's motion for summary judgment is **DENIED** regarding Plaintiffs Catherine Walton, Dennis Walton, Denise Voyles, Anthony Voyles, Constance Van Doren, William Van Doren, Deborah Valvo, Michael Valvo, Susan Stone, George Stone, Dianne Schmid, Joseph Schmid, Gayne Meadows-Roberts, Robert Roberts, Flora Rela, Federico Pratts, Elida Perez, Julio Perez, Lana Meschino, Paul Meschino, Mary Olivas, Frank Meier, Ellen McAvoy, Charles McAvoy, Sharyn Roettger, Stan Malecki, Irmgard Lisi, Ronald Kroll, Diana King, Baeley Jaikaran, Katie Hoehn, Ryan Hoehn, Bonnie Hill, Robert Hill, Fred Hearn, Donna Hauser, Richard Hauser, Wanda Crowell, Julius Harris, Shirley Hallman, Diana Graham, Thomas Graham, Gay Glassman, Deborah Friske, Robert Friske, Carol Ferkinoff, Marvin Ferkinoff, Richard Czajka, Mary Lou Constant, Robert Constant, Christine Clewes, Carol Charland, William Charland, Diane Beaudoin, Daniel Beaudoin, Lisa Allen, Robert Allen, Mary Alice Agusta, and Vincent Agusta's, claims that the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A). An order will be entered simultaneously with this opinion.

It is so ordered.

\#    \#    \#

**Service List**:

**Peter G. Tsarnas**
Goldman & Rosen, Ltd.
11 South Forge Street
Akron, OH 44304

**Jeremy M. Cothern**
Berke, Berke & Berke
420 Frazier Avenue
P.O. Box 4747
Chattanooga, TN 37405

**Sequatchie Mountain Creditors**
c/o William C. Killian, Esq.
1 Oak Avenue
Jasper, TN 37347

**Valerie W. Epstein**
Epstein Law Firm, PLLC

720 Cherry Street
Chattanooga, TN 37402

**Anthony J DeGirolamo**
3930 Fulton Drive NW, Suite 100B
Canton, OH 44718
330-305-9700

**Scott M Zurakowski**
PO Box 36963
4775 Munson St NW
Canton, OH 44735-6963

**Stephan R. Wright**
Fleissner, Davis and Johnson
600 Georgia Avenue
Chattanooga, TN 37402

**Joseph J. Detweiler**
2814 Edison Street NW
Uniontown, OH 44685