**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 03:39 PM February 16, 2017**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| JOSEPH J. DETWEILER, | ) | CASE NO. 09-63377 |
| | ) | |
| Debtor. | ) | ADV. NO. 09-6118 |
| _____ | ) | |
| | ) | JUDGE RUSS KENDIG |
| SEQUATCHIE MOUNTAIN | ) | |
| CREDITORS, | ) | |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM OF OPINION (NOT** |
| v. | ) | **INTENDED FOR PUBLICATION)** |
| | ) | |
| JENNIFER L. LILE, Executor and | ) | |
| Representative of the Estate of | ) | |
| Joseph J. Detweiler, | ) | |
| | ) | |
| Defendant. | ) | |

This adversary proceeding arises in the chapter 11 bankruptcy proceeding of Joseph Detweiler ("Debtor"). Debtor filed his chapter 11 bankruptcy petition on August 17, 2009. On October 19, 2009, purchasers of undeveloped land at Sequatchie Pointe ("Plaintiffs[1]") filed an adversary complaint. Plaintiffs allege in their complaint that Debtor's misrepresentations and fraudulent conduct caused $13,500,000.00 in nondischargeable damages under 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6). On January 25, 2016, the court granted summary judgment in Debtor's favor on Plaintiffs' claims under § 523(a)(4) and (a)(6). Additionally, Debtor was

---

[1] Plaintiffs in this instance and when used throughout the opinion refers to all of the plaintiffs remaining in this adversary proceeding as of March 7, 2016.

1

granted summary judgment on Wesley Jinks, Mary Czajka, Ana Rodriguez, William King, Manuel Real, Gene Renz, Joyce Renz, and the Estate of John Hallman's claims under § 523(a)(2)(A). On March 7, 2016, a four-day trial commenced regarding the Plaintiffs' remaining § 523(a)(2)(A) claims. On September 15, 2016, Debtor's attorneys filed a notice of suggestion of death for Debtor, Joseph Detweiler. On September 28, 2016, Plaintiffs filed a motion to substitute Jennifer L. Lile ("Defendant"), Executor and Representative of the Estate of Joseph J. Detweiler, as the defendant in this matter.

The Court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

This Memorandum of Decision addresses the Plaintiffs' remaining claims under § 523(a)(2)(A). Regardless of whether specifically mentioned in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of witnesses, considered all of the evidence, and reviewed the entire record of the case. During trial, the parties agreed to introduce many of the witnesses' depositions in lieu of live testimony. Based upon a review of the facts, and for the following reasons, the court find that George Stone, Susan Stone, Marvin Ferkinhoff, Carol Ferkinhoff, Charles McAvoy, and Ellen McAvoy, are entitled to judgment in their favor on their § 523(a)(2)(A) claims. Jennifer Lile ("Defendant") is entitled to judgment in her favor on all other § 523(a)(2)(A) claims.

## FACTUAL BACKGROUND

This adversary proceeding arises out of a failed development project known as Sequatchie Pointe. Sequatchie Pointe was a planned development of over 6,756 acres of land in Marion County, Tennessee, and Dade County, Georgia.

### I.     Parties

Debtor was the sole owner and director of J.J. Detweiler Enterprises, Inc. ("JJDEI") and Sequatchie Mountain, LLC ("Sequatchie"). During the pendency of this litigation but after the completion of the trial Debtor passed away. Jennifer Lile, Executor and Representative of the estate of Joseph Detweiler, was substituted as the Defendant in this matter. Both companies are incorporated under Ohio law. Sequatchie was a limited liability company created in 2005 specifically to facilitate the Sequatchie Pointe project. Debtor was in the business of selling undeveloped land for over 40 years. Debtor started his own land company, JJDEI, in 1982. JJDEI's business model is to purchase, subdivide, and sell undeveloped land. Prior to Sequatchie Pointe, only one of JJDEI's previous projects, Wilder Mountain, involved the installation of any infrastructure. Typically, JJDEI would buy large tracts of land and subdivide it with each parcel maintaining access to existing roadways and utilities.

As the sole owner of Sequatchie and JJDEI, Debtor oversaw the Sequatchie Pointe project from Ohio. Debtor visited Sequatchie Pointe sparingly during the years of the

2

development. According to Debtor, he approved the advertising by Fred Fetzner and helped determine the price of the lots. In addition, Debtor had final authority regarding the approval of the sales at Sequatchie Pointe. Otherwise he was not directly involved with the day to day operation of Sequatchie Pointe or the training of the sales force.

This case involves fifty-nine Plaintiffs and sales that took place from October 2006 to October 2008. Plaintiffs in this case are all purchasers of vacant land at Sequatchie Pointe. Although each party has filed individual claims and this matter is not a class action there are similarities in their testimony regarding their purchase of land at Sequatchie Pointe. Generally, the Plaintiffs received a direct mail advertisement, or viewed an ad in a local newspaper. The advertisement offered a weekend trip to the Chattanooga area with a discounted hotel price and a gift card to help cover travel costs. In return, Plaintiffs were required to visit Sequatchie Pointe and meet with a salesperson.

The majority of Plaintiffs took the offered trip and toured Sequatchie Pointe. During their visits, Plaintiffs were told that the development would include water, electric, and roads. Plaintiffs were also told that there were plans to build a clubhouse with a pool, an equestrian center, riding and hiking trails, and that the development would be a gated community with a beautiful entrance. Plaintiffs were told that these amenities and utilities would be completed within certain timelines. The timelines for completion of the amenities and utilities varied depending on the state of construction but generally were within a year of the purchaser's visit.

The following Plaintiffs are listed in chronological order based on the date they purchased a lot at Sequatchie Pointe. The following is not exhaustive of Plaintiffs' testimony, but includes the dates of purchase and some relevant facts.

Robert and Lisa Allen visited Sequatchie Pointe in October of 2006. On October 11, 2006, the Allens purchased Tennessee Lot 45 in Phase One of the development for $99,900. Then in May of 2007 Mr. and Mrs. Allen purchased a second lot in Georgia for $29,900.

George and Susan Stone purchased Tennessee Lot 3 on November 25, 2006, for $35,000. In August of 2007 George Stone received a call from Sequatchie Pointe salespersons stating that they were in Florida and wanted to visit him at home and discuss the purchase of additional lots. On August 26-27, 2007, the Stones purchased two Georgia lots, 37 and 41. The Stones paid $29,000 for lot 37 and $34,000 for lot 41. George Stone testified that he had questions about the completion of the project and was assured that it would not be a problem because it was bonded.

Diana King purchased Tennessee Lot 6 on January 6, 2007, for $127,000. Ms. King learned about Sequatchie Pointe from an advertisement in the Orlando Sentinel and took the trip offered trip to view the properties.

Ryan Hoehn purchased Tennessee Lot 28 on January 12, 2007, for $78,000. Ryan's wife, Katie Hoehn, did not sign any of the purchase documents. Mr. Hoehn's main point of contact at Sequatchie Pointe was Dan Graber. Mr. Graber provided him with timelines for the completion of the roads and amenities.

3

Shirley Hallman purchased a total of four lots at Sequatchie Pointe. On January 23, 2007, she purchased Tennessee Lot 24 for $80,000. On June 9, 2007, Mrs. Hallman purchased three additional lots for $50,000 each. The lots were Tennessee Lots 79, 178, and 183. According to Mrs. Hallman these lots were purchased in conjunction with a contractor recommended by Dan Graber to build spec houses on the lots and sell them in the future. The contractor, Shawn Carter, died before he could complete the house building.

Frank Meir visited Sequatchie Pointe in January of 2007. On January 31, 2007, Mr. Meir purchased Tennessee Lot 180 for $59,900.

Marvin and Carol Ferkinhoff purchased Georgia Lot 77 on April 13, 2007, for $54,900. Dan Graber showed them their property on the Georgia side of Sequatchie Pointe. The Ferkinhoff's were told that the lot they viewed wouldn't be available the next day. According to Marvin the reason they purchased the lot was because of the promised development and because the project was bonded.

Anthony and Denise Voyles visited Sequatchie Pointe and purchased Tennessee Lot 191 on June 14, 2007, for $55,000. Then on August 20, 2007, the Voyles purchased Tennessee Lot 120 for $33,000. On August 24, 2007, the Voyles purchased Tennessee Lot 119 for $40,000. The second and third purchases of lots took place at their home in Florida. Brad Watson, Matt Sliger, and Lucas Alonzo visited them in Florida on a sales call to promote purchasing additional lots.

Constance and William Van Doren visited Sequatchie Pointe on July 1, 2007 and purchased Tennessee Lot 211 for $39,900. The Van Dorens believe that the lot they were sold is not the lot on their deed.

Robert and Mary Lou Constant purchased Tennessee Lot 188 on July 21, 2007, for $59,900.

Frederico Pratts purchased Georgia Lot 85 on July 22, 2007, for $39,400. According to Mr. Pratts he attempted to build a home at Sequatchie Pointe but could not put in a septic tank.

Christine Clewes visited Sequatchie Pointe on July 27, 2007, and purchased Tennessee Lot 258 for $79,000.

Richard Czajka purchased Tennessee Lot 248 on July 27, 2007, for $150,000.

Charles and Ellen McAvoy visited Sequatchie Pointe on August 7, 2007. During their visit Charles and Ellen purchased Georgia Lot 35 for $39,900. The McAvoys met Debtor during their trip. According to Mr. McAvoy Debtor told him the project was bonded. However, the bonds did not cover the roads in Georgia.

Baeley Jaikaran purchased Tennessee Lot 186 on August 15, 2007, for $95,000. While visiting Sequatchie Pointe Baeley observed construction taking place.

Flora Real visited Sequatchie Pointe for the first time in May of 2007. On May 29, 2007, she purchased Tennessee Lot 205 for $46,750. Ms. Real met the Debtor during her sales meeting and he confirmed the price of the lot. Then on August 20, 2007, Ms. Real purchased Georgia Lot 120 for $33,000. The second purchase took place at her home in Florida during an in person sales call from Sequatchie Pointe salespeople.

Richard and Donna Hauser purchased Georgia Lot 121 for $49,000. The purchase took place during the Hausers' visit to Sequatchie Pointe on September 8, 2007.

On October 14, 2007, Robert and Deborah Friske purchased Georgia Lot 70 for $60,000. The Friskes lived near Sequatchie Pointe and becoming interested in a lot after seeing all the construction activity taking place.

Gay Glassman visited Sequatchie Pointe in November 2007. On November 16, 2007, Ms. Glassman purchased Tennessee Lot 212 for $60,000.

On March 29, 2008, Paul and Lana Meschino purchased Tennessee Lot 228 for $95,000. The Meschinos live approximately 30 minutes away from Sequatchie Pointe. Lana Meschino heard about the development from her mother and they decided to visit and take a tour of the properties.

Carol and William Charland visited Sequatchie Pointe in May 2008. On May 16, 2008, they purchased Tennessee Lot 214 for $49,900.

Julio and Elida Perez set up a visit to Sequatchie Pointe in June of 2008 after seeing a flyer. Mr. and Mrs. Perez purchased Tennessee Lot 213 for $65,200 on June 1, 2008.

Daniel and Diane Beaudoin took a trip to Sequatchie Pointe in June of 2008 to view the property. On June 11, 2008, the Beaudoins purchased Tennessee Lot 135 for $59,900.

Vincent and Mary Alice Augusta purchased Tennessee Lot 147 on June 29, 2008, for $63,400. Mr. Augusta stated that Debtor was present for the closing of their sale and affirmed the representations of the salespeople that the amenities and utilities would be completed and that there were bonds taken out for the project.

Dennis and Catherine Walton visited in July of 2008. On July 2, 2008, the Waltons purchased Tennessee Lot 253 for $75,000.

Fred and Ana Hearn took a trip to Sequatchie Pointe after receiving a flyer in the Tampa Tribune. On July 9, 2008, the Hearns purchased Tennessee Lot 261 for $69,900.

Robert A. Roberts and Gayne Meadows-Roberts visited Sequatchie Pointe after seeing a flyer advertising a min-vacation in the St. Petersburg Times. On July 17, 2008, the Roberts purchased Tennessee Lot 219 for $171,700. The Roberts met Debtor after the completion of their purchase and did not rely on anything he said during their conversation.

Michael and Deborah Valvo took a trip to visit Sequatchie Pointe after seeing an advertisement in the Tampa Bay Times. On July 19, 2008, the Valvos purchased Tennessee Lot 256 for $45,000.

Joseph and Diane Schmid learned about Sequatchie Pointe from an advertisement in the local paper and took advantage of the offer for a mini-vacation. On July 25, 2008, the Schmids purchased Tennessee Lot 283 for $212,000. The Schmids met Debtor during their purchase and he agreed to sell them the lot for $212,000, but did not make any other representations regarding the property.

Irmgard Lisi learned about Sequatchie Pointe from her husband who saw a flyer in the Tampa Tribune. On July 26, 2008, Irmgard purchased Tennessee Lot 251 for $199,900.

Thomas and Diana Graham learned about Sequatchie Pointe from a flyer in the mail and visited the project on August 15-16, 2008. On August 16, 2008, the Grahams purchased Tennessee Lot 199 for $79,900. The Grahams were introduced to Debtor during their purchase and he was present for the representations made by their salesperson.

Julius Harris and Wanda Crowell learned about Sequatchie Pointe from a friend and decided to set up a visit. After visiting on September 2, 2008, Julius and Wanda purchased Tennessee Lot 276 for $176,900 on September 3, 2008.

Robert and Bonnie Hill saw a flyer advertising Sequatchie Pointe and decided to visit. On September 19, 2008, the Hills purchased Tennessee Lot 129 for $61,000.

Ronald Kroll saw an advertisement in the Orlando Sentinel and took a trip to view the properties at Sequatchie Pointe. On October 3, 2008, Mr. Kroll purchased Tennessee Lot 127 for $51,900.

Sharyn Roettger heard about Sequatchie Pointe from a flyer and decided to visit with Stan Malecki. On October 26, 2008, Stan and Sharyn purchased Tennessee Lot 126 for $62,500.

## II.    Sequatchie Pointe Development, Financing, and Sales

Sequatchie Pointe was to be subdivided and sold as individual lots to buyers. JJDEI purchased the land for Sequatchie Pointe for $10,809,600.00. The development was to include infrastructure, including water and electric and roads originating in both Tennessee and Georgia. Additional amenities such as a clubhouse, pool, equestrian center, and riding trails were also planned. According to Debtor the funding to complete the development and install the improvements was to come predominantly from lot sales.

The project was financed by ArborOne Enterprises, Inc. ("ArborOne"). ArborOne provided two loans and a revolving line of credit. The financing involved three agreements between ArborOne and Sequatchie, JJDEI, Wilder Mountain, LLC, and Debtor. The agreements were the following: Term Loan No. 1, Term Loan No. 2, and a revolving line of credit. The first loan was for $5,718,911.00 involving the refinancing of outstanding loans owed to ArborOne.

The second loan was for the $7,566,721.00 to purchase the land for Sequatchie Pointe. The revolving line of credit was for $5 million.

ArborOne also provide a letter of credit in October of 2008 for $1.4 million. In addition to loans from ArborOne, Tennessee required that bonds be secured for the construction of the roads, for the Marion county portion of the project.

In December of 2006, ArborOne sent a default notice regarding a breach of the loan agreement requiring the borrowers to maintain a thirty-five percent owner equity percentage. The matter was not cured in a timely manner resulting in ArborOne sending a second default notice regarding the owner equity percentage in May 2007. The second letter granted a waiver of the default if the default interest amount of $89,746.03 was paid. Sequatchie paid the default interest amount. ArborOne sent another default letter dated July 27, 2007, regarding the owner equity percentage covenant. ArborOne again offered a waiver, this time on the condition that a fee of 50 basis points was provided. Finally, nearly eighteen-months later, in an ArborOne letter dated January 15, 2009, the loans were declared in default because an installment payment had been missed. As a result, ArborOne changed the special release provision and required that the entire amount of the purchase price that Sequatchie received for all future lot sales be paid to ArborOne. Debtor appealed ArborOne's decision to require one hundred percent of lot sales and attempted to refinance the loans with ArborOne. On April 2, 2009, ArborOne's Credit Review Committee sent a letter denying Debtor's appeal and restructuring of the loans.

Debtor is adamant that he intended to finish Sequatchie Pointe. Debtor stated that he mortgaged other properties and sold "paper" (other receivables he owned) to invest two million dollars of his own money into Sequatchie Pointe. It was not until ArborOne changed the special release provisions in January 2009 that Debtor knew Sequatchie Pointe project was never going to be finished.

Robert Spivey's deposition testimony was introduced into evidence at trial. Mr. Spivey is the Senior Vice-President manager of capital markets in the Bond Department at ArborOne. Mr. Spivey has worked for ArborOne and its predecessor Pee Dee Farm Credit since 1987. Mr. Spivey was working for ArborOne as a credit analyst when the loans were first issued for Sequatchie Pointe. Mr. Spivey stated that he was responsible for servicing the Sequatchie Pointe loans. ArborOne had a lending relationship with Debtor preceding the loans for Sequatchie Pointe. Mr. Spivey testified that ArborOne did not require one hundred percent of the sale proceeds until January of 2009. According to Mr. Spivey, the loans should have been issued because Debtor and his companies had strong credit and were consider a low risk to default.

Russell Phillips, the managing partner of the Phillips Organization, testified at trial regarding the financial condition of the Debtor and his companies. The Phillips Organization is an accounting and consulting firm. Mr. Phillips is a certified public accountant and valuation analyst with 32 years of experience. Mr. Phillips specializes in bankruptcy and insolvency and has worked on numerous bankruptcy matters.

Mr. Phillips testified as a summary witness regarding the financial documents of JJDEI and Sequatchie. Debtor hired Mr. Phillips in December of 2008 to review the Sequatchie Pointe

project as the project was having difficulties getting additional funding. Mr. Phillips reviewed the financial statements, tax returns, project plans, and updated cost estimates. In April of 2009, Mr. Phillips assisted the Debtor in his attempt to restructure the loans with ArborOne.

According to Mr. Phillips Sequatchie Pointe became unfeasible in January of 2009 when ArborOne required one hundred percent of the lot sales. Mr. Phillips confirms Debtor's testimony that it was not until ArborOne began requiring all of the sale proceeds that there was not enough money to complete the infrastructure as promised.

Fred Fetzner marketed the development to prospective purchasers in Florida. Mr. Fetzner, through his company Katmandu, prepared advertisements for Florida newspapers and sent them to Debtor for approval. The only advertising Katmandu and Mr. Fetzner performed was placing ads in numerous Florida newspapers. Mr. Fetzner's company was paid on commission from the sales of people referred through advertising and received a two percent override on sales. According to Mr. Fetzner, Katmandu was paid in full. The advertisements offered interested buyers a three-day, two-night stay at a hotel in Chattanooga and a gift card for travel expenses if the prospective buyer visited Sequatchie Pointe and viewed the lots available for purchase. According to Mr. Phillips approximately $3.1 million was spent on advertising and promotion.

Sequatchie Pointe also had a website. The website discussed the amenities and the beautiful views. The website made the same offer of an affordable hotel stay to come view the property. The website also advertised owner financing, which a number of Plaintiffs utilized to purchase their lots.

Cheryl McDonald, Debtor's daughter, was a previous part-owner of Sequatchie and executive vice-president of JJDEI. Ms. McDonald worked at JJDEI for over 26 years until 2011 when Debtor terminated her. Her primary responsibilities were accounting, paying bills, and preparing financial statements.

Ms. McDonald's deposition was introduced into evidence. Ms. McDonald stated that Sequatchie Pointe involved the construction of more infrastructure than any of JJDEI's previous projects. There were times that JJDEI had cash flow issues regarding paying for construction projects at JJDEI because of the planned infrastructure. According to Ms. McDonald the failure to complete Sequatchie Pointe resulted from the economy, inadequate capital for infrastructure, and ArborOne requiring one hundred percent of the lots sales.

Sequatchie Pointe employed a number of salespeople. The sales force did not receive any specific training. New salespeople shadowed the more senior members of the sales force and learned on the job. Generally, the salesperson would meet the prospective purchaser, take them to the sales office, give them a tour of Sequatchie Pointe, and show the lots available for purchase. During the tour the salesperson would show them the artist renderings of the clubhouse, discuss the amenities and utilities, and sometimes play a DVD explaining the plans for Sequatchie Pointe. The sales force at Sequatchie Pointe provided timelines for the completion of construction. These timelines were based on the bond documents for the roads and information provided by Dan Graber. Plaintiffs testified that construction was not completed

by the timelines promised during sales visits, and the timelines were extended when they inquired regarding the delays.

If the customer wished to purchase a lot the salesperson would take them back to the sales office and go over the required paperwork with them. The closing paperwork at Sequatchie Pointe included a number of documents. According to Ervin Moore, a salesperson at Sequatchie Pointe, they were required to review each document with the purchaser prior to them signing.

Included in the closing paperwork was a HUD report outlining the risks of buying undeveloped land and explaining that there is no guarantee of completion of the utilities and amenities. All of the Plaintiffs signed a document attesting that they received and reviewed the HUD report.

The depositions of salespeople, Ervin Moore, Ian Hearn, Matt Sliger, Brandon Oliger, and Lucas Alonzo, were introduced into evidence. All of the salespeople stated that they never intentionally misled any customers nor was there a scheme to mislead buyers. Matt Sliger and Lucas Alonzo stated that the sales force was instructed to review the HUD report with every purchaser. In addition, Ervin Moore, Ian Hearn, and Brandon Oliger testified that they reported to Dan Graber, who was involved with sales, and it was Mr. Graber who provided them with estimates for completion of the amenities and infrastructure that they provided to Plaintiffs.

Debtor entered Dan Graber's, the Sequatchie Pointe project manager, deposition into evidence at trial as well as Mr. Graber's deposition taken in a related state court case. As project manager, Mr. Graber was in charge of overseeing construction at Sequatchie Pointe.

According to Mr. Graber the project had financial difficulties from nearly the beginning and Debtor struggled to pay contractors. Additionally, Mr. Graber stated that Debtor told the salespeople to provide misleading timelines and knew that the project wouldn't be completed.

The court does not find Dan Graber's testimony to be credible. Nearly all who mentioned him painted a portrait with an exceedingly thin veneer of honesty. Many of his co-workers and his employer described him as untrustworthy. Additionally, Mr. Graber stated in his deposition that he never sold a lot and that he wasn't involved in sales, a statement that was disproved by his fellow salespeople and numerous Plaintiffs who testified regarding his involvement in the sales process. Mr. Graber also stated that he never told the sales force what do but contradicted his own testimony by also admitting that he gave the sales force instructions that conflicted with instructions from the Debtor. According to the salespeople, they reported to and took direction from Mr. Graber, contradicting his testimony.

Sequatchie Pointe experienced construction setbacks. There were multiple road slides requiring additional construction in order to move the road and fill in a stream that it crossed. Mr. Phillips testified that in total the project would cost six million dollars more than originally planned.

By the time construction ceased at Sequatchie Pointe in early 2009 there were paved roads throughout Phase 1 in Tennessee. Electricity and water lines had been run through Phase 1

along the main roads, but there is no water supply to connect to the lines. Nor is any supply nearby. Gravel roads had been installed through eighty percent of Phase 2. However, the road into the project over a river was never fully completed. Currently, the internal roads do not connect to the state highway, the entrance was never completed, and a number of the roads have been damaged by subsequent mountain slides. According to the Plaintiffs who have attempted to visit since construction halted their lots were not reachable by car, because the main road slide is near the very bottom.

## LAW AND ANALYSIS

### I.    Plaintiffs Motion to Substitute Jennifer L. Lile, Executor and Estate Representative for Joseph Detweiler is Granted

Before the court is the issue of whether Jennifer L. Lile, the executor and representation of Joseph Detweiler's estate, can be substituted as the Defendant for the deceased Debtor. Federal Rule of Civil Procedure 25(a)(1), made applicable in bankruptcy proceedings by Fed. R. Bankr. P. 7025 states, in relevant part, as follows:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

It is undisputed that the remaining claims in this adversary proceeding are not extinguished by Debtor's death. Thus, substitution of the estate representative is possible within the requirements of Rule 25(a)(1). On September 15, 2016, Debtor's attorney filed a Notice of Suggestion of Death for Debtor Joseph Detweiler. Plaintiffs' filed a motion to substitute Jennifer Lile in this adversary proceeding on August 28, 2016. Plaintiffs' motion was well within the 90-day period as required by the rule. There are no objections to the substation of Jennifer Lile in place of the deceased Debtor. Accordingly, the court grants Plaintiffs' Motion to Substitute Jennifer L. Lile, representative of the Debtor's estate, as the Defendant in this adversary proceeding.

### II.   The Court Will Continue to Exercise Jurisdiction Over the Adversary Proceeding

Debtor died after the completion of a trial but prior to a final judgment on the dischargeability of the Plaintiffs' debts under 11 U.S.C. § 523(a)(2)(A). The court requested briefing on whether the underlying Chapter 11 case could continue without Debtor's income funding the plan and what effect, if any, his death had on the adversary proceeding. Debtor's death renders his Chapter 11 plan unfeasible as it was based on his continued income. Accordingly, the court will dismiss the Debtor's Chapter 11 bankruptcy case. All parties to this adversary proceeding requested that the court retain jurisdiction over the adversary proceeding and rule on any potential liability and damages regarding the Plaintiffs' claims under § 523(a)(2)(A).

The dismissal of the underlying bankruptcy case does not automatically strip a federal court of jurisdiction over an adversary proceeding. Querner v. Querner (In re Querner),7 F.3d 1199, 1201–02 (5th Cir. 1993); Fidelity & Deposit Co. of Maryland v. Morris (In re Morris), 950 F.2d 1531, 1533 (11th Cir. 1992); Smith v. Commercial Banking Corp. (In re Smith), 866 F.2d 576, 580 (3d Cir. 1989). Generally, the dismissal of a bankruptcy case results in the dismissal of adversary proceedings, but that rule is not without exceptions. In re Smith, 866 F.2d at 580. "The decision whether to retain jurisdiction over the adversary proceeding should be left to the sound discretion of the bankruptcy court…." In re Morris, 950 F.2d at 1534.

The Sixth Circuit Court of Appeals has only addressed the issue of retained jurisdiction after dismissal in a footnote. Javens v. City of Hazel Park (In re Javens), 107 F.3d 359, 364 n.2 (6th Cir. 1997). The court noted that an action under section 362(h) of the Bankruptcy Code for damages for a willful violation of automatic stay survives dismissal of the bankruptcy case. Id. The court also observed that the "dismissal of an underlying bankruptcy case does not automatically strip a federal court of residual jurisdiction to dispose of matters after the underlying bankruptcy case has been dismissed." Id. (citing Lawson v. Tilem (In re Lawson), 156 B.R. 43, 45 (B.A.P. 9th Cir. 1993); Carraher v. Morgan Electronics, Inc. (In re Carraher), 971 F.2d 327, 328 (9th Cir.1992); In re Morris, 950 F.2d at 1534; In re Smith, 866 F.2d at 580). Instead, the "exercise of such jurisdiction is left to the sound discretion of the trial court." In re Javens, 107 F.3d at 364 n.2. Courts determining whether to retain jurisdiction over an adversary proceeding consider the following factors: "judicial economy, convenience to the parties, fairness, and comity." Porges v. Gruntal & Co., Inc. (In re Porges), 44 F.3d 159, 163 (2d Cir. 1995); see also In re Carraher, 971 F.2d at 328 (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 353 (1988)).

Here, judicial economy is best served by this court retaining jurisdiction. This adversary has been pending for seven-years and the trial has already concluded; all that remains is for the court to rule on the remaining claims. Dismissing the adversary proceeding would require additional litigation in state or probate court. Additionally, the most convenient result is for this court to retain jurisdiction. The proceedings have concluded; dismissing the matter would only increase the expense and difficulty for the parties as it would necessitate litigation in another jurisdiction involving the costs and difficulties that are inherent in a complex dispute. Although Plaintiffs were not able to advance any potential breach of contract claims in this court, fairness does not demand that the court dismiss the adversary proceeding over the objection of the parties. Most importantly, the parties have expressed their desire for the court to retain jurisdiction over this adversary proceeding. The parties express consent to the continued jurisdiction of this court over the adversary proceeding weighs heavily in favor of this court retaining jurisdiction. Considering the In re Porges factors the court is within its discretion to retain jurisdiction over this adversary proceeding following the dismissal of the main bankruptcy case.

In addition to the retention analysis, post Stern v. Marshall there are also constitutional considerations in determining whether the bankruptcy court has jurisdiction over claims after the dismissal of the underlying bankruptcy case. 564 U.S. 462 (2011). In Stern, the Supreme Court held that a bankruptcy court does not have the authority under Article III to enter final judgments in related matters. Id. at 482. In a subsequent case, discussing Stern, the Supreme Court held that

the parties knowing and voluntary consent to the bankruptcy court's jurisdiction negates the Article III violation. Wellness Intern. Network, Ltd. v. Sharif, 135 S. Ct. 1932, 1939 (2015). Consent may be expressed or implied. Id. at 1948. The key inquiry is whether "'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." Id. (quoting Roell v. Withrow, 538 U.S. 580, 590 (2003)). Presently, the parties to the adversary proceeding provided express consent for the court to retain jurisdiction and rule on liability and damages of the remaining claims in the adversary proceeding. Accordingly, the court will retain jurisdiction over the adversary proceeding after the dismissal of the main bankruptcy case.

### III.    Plaintiffs are not Entitled to an Adverse Inference

Plaintiffs seek an adverse inference due to the fact that Debtor and Cheryl McDonald did not provide live testimony at trial. This is commonly referred to as the missing witness rule. According to the Sixth Circuit Court of Appeals, in order to receive an inference two factors must be present: "(1) that the uncalled witness is peculiarly within in the control of one party; and (2) that the anticipated testimony will 'elucidate the transaction.'" Yuk Shau Mui v. Wing, No. 86-3673, 1987 WL 38041 *3 (6th Cir. July 10, 1987)(citing United States v. Blakemore, 489 F.2d 193, 195-96 (6th Cir. 1973)).[2] The inference is permissive, not mandatory. Crossley Constr. Corp. v. NCI Bldg. Sys., L.P., 123 Fed. Appx. 687, 693 (6th Cir.2005) ("The missing witness rule, however, does not require the trier of fact to draw a negative inference. To the contrary, the rule operates to permit the trier of fact to draw the negative inference."). A determination of a witness's availability must take into consideration both their relationship to the party and their physical availability. Blakemore, 489 F.2d at 195.

The court will not apply an adverse inference to the Debtor or Cheryl McDonald's testimony. Neither witness is peculiarly within the control of one party. Plaintiffs subpoenaed both potential witnesses and they were available to testify. In fact, Debtor was present in the courtroom. Plaintiffs decided not to call them to the stand, even though they were able to do so. Additionally, an adverse inference is not necessary because the witnesses' deposition transcript was introduced into evidence. At trial Plaintiffs did not raise an objection to the introduction of the witnesses' deposition testimony. Instead Plaintiffs elected to read portions of the Debtor's deposition into evidence during their case-in-chief. Debtor and Cheryl McDonald's live testimony would have been pertinent to the issues in this case. Because the Plaintiffs had the ability to call them to the stand and made the tactical decision not to do so, an adverse inference is not applicable.

### IV.    The HUD Report's Deficiencies May Not Serve as the Factual Basis of a Claim for Fraudulent Misrepresentation

The next issue before the court is whether deficiencies in the HUD reports provided to Plaintiffs can be considered as evidence in determining liability. Plaintiffs argue that the HUD

---

[2] Plaintiffs assert that Tennessee law controls this issue. It does not. The determination of whether an adverse inference should apply regarding the testimony of witnesses is a matter of evidence. Accordingly, the Federal Rules of Evidence and federal case law is controlling. See, Fed. R. Evid. 101(a) & 1101(a); State Farm Auto. Co. v. Knerr (In re Knerr), 361 B.R. 858, 861 n.1 (N.D. Ohio 2007).

property reports provided to each purchaser are evidence of fraud because they do not comply with the requirements of 24 C.F.R. 1710, *et seq*. Debtor counters that the court should not consider this argument because it was raised impermissibly for the first time in post-trial briefing in violation of Fed R. Civ. P. 9(b). Plaintiffs responded, arguing that they are only responding to Debtor's use of the HUD reports in their defense, and that Fed. R. Civ. P. 15(b)(2) allows for the consideration of issues tried by consent.

It is well established that fraud must be pled with particularity. Fed. R. Civ. P. 9(b). Bankruptcy Rule 7009 makes this provision applicable in Bankruptcy Proceedings. "To satisfy FRCP 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentation(s) upon which he relied." Bender v. Southland Corp., 749 F.2d 1205, 1216 (6th Cir. 1984). The specific pleading requirements of Rule 9(b) are applicable to claims based on fraudulent misrepresentations under § 523(a)(2)(A). Vogt v. Hastings (In re Hasting), No. 13-34506, Adv. No. 14-03022, 2015 WL 1598055 *4 (Bankr. N.D. Ohio, April 6, 2015) ("[I]n properly pleading a plausible cause of action under § 523(a), a plaintiff must at least identify a claimed misrepresentation by the what, where, and when and state facts from which reliance and intent may at least reasonably be inferred by the court."); Iwaszczenko v. Neale (In re Neale), 440 B.R. 510, 517 (Bankr. W.D. Wis. 2010); Trell v. Dunlevy (In re Dunlevy), 75 B.R. 914, 916 (Bankr. S.D. Ohio 1987).

Here, Plaintiffs raised the issue regarding the HUD reports deficiencies for the first time in their post-trial briefing and revised findings of facts and conclusions of law. Raising these factual issues in support of their fraudulent misrepresentations claims for the first time only after the close of trial does not comply with the requirements of Rule (9)(b). Plaintiffs had numerous opportunities at the very least to mention their argument that the HUD reports were deficient and they failed to do so. See St. Marys Cement Co., v. Leach (In re Leach), No. 08-60100, Adv. No. 08-6046, 2009 WL 1595702 *9 (Bankr. N.D. Ohio March 26, 2009). Plaintiffs were required to plead the particular representations that supported their claims under § 523(a)(2)(A) and they did not do so regarding the HUD reports. Accordingly, the HUD reports alleged deficiencies cannot serve as the basis for a claim under § 523(a)(2)(A).

According to Fed. R. Civ. P. 15(b)(2):

> For Issues Tried by Consent. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

"The general rule is when issues not raised in pleadings are raised by the express or implied consent of the parties, the court may treat the issue in all respects as if the parties had raised them in the pleadings." Yellow Freight Sys., Inc. v. Martin, 954 F.2d 353, 358 (6th Cir. 1992). It is not enough for a party to have introduced evidence relevant to an unpleaded issue. Kehoe Component Sales Inc. v. Best Lighting Products, Inc., 796 F.3d 576, 595 (6th Cir. 2015). Instead, "[i]t must appear that the parties understood the evidence to be aimed at the unpleaded issue." Id. Rule 15(b)(2) requires that the opposing party have notice in order for implied

consent to apply. Thus, "an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled." Id. (quoting Douglas v. Owens, 50 F.3d 1226, 1236 (3d Cir. 1995)).

Here, the issue was not tried by implied consent at trial. At trial there was no discussion regarding the HUD reports compliance with the governing regulations. Neither party introduced testimony regarding the HUD report's deficiencies. Because Debtor was not on notice prior to the post-trial briefing on this issue it was not tried by implied consent at trial.

The court will not consider the HUD report's alleged deficiencies as a misrepresentation serving as the basis for a claim under § 523(a)(2)(A). However, both parties stipulated that the HUD reports were admissible and entered into evidence. Plaintiffs are correct that Debtor has relied upon the HUD reports to support their defense. Debtor cross-examined every Plaintiff regarding whether they received the HUD. Debtor is relying on the representations in the HUD reports to argue that the Plaintiffs failed to satisfy their burden regarding justifiable reliance. Therefore, how much weight to give the HUD reports as evidence refuting justifiable reliance *was* at issue at trial. For the limited purpose of weighing this defense the court will consider whether the HUD reports sufficiently complied with the regulations governing their creation.

### V.    Defendant is Liable for Misrepresentations Under 11 U.S.C. § 523(a)(2)(A)

The primary issue in this litigation is whether Defendant is liable for misrepresentations under 11 U.S.C. § 523(a)(2)(A). Plaintiffs claim that Debtor personally or through his agents violated § 523(a)(2)(A) by making fraudulent representations to the Plaintiffs that caused them to purchase lots at Sequatchie Pointe. Defendant argues that Plaintiffs' claims are dischargeable because the representations are nothing more than promises to perform in the future resulting in breach of contract claims rather than nondischargeable fraudulent misrepresentations.

### a.    Standard Under 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) of the Code renders nondischargeable any debt "for money, property, services . . . obtained by -- (A) false pretenses, a false representation, or actual fraud…" A creditor must prove the following elements in order to except a debt from discharge due to false pretense or false representation:

> (1) the debtor obtained money or services through a material
> misrepresentation that, at the time, the debtor knew was false or
> made with gross recklessness as to its truth;
> (2) the debtor intended to deceive the creditor;
> (3) the creditor justifiably relied on the false representation; and
> (4) its reliance was the proximate cause of loss

Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 280–81 (6th Cir. 1998). False pretenses are implied misrepresentations or conduct intended to create a false impression, as opposed to a false representation, which is an express misrepresentation. Haney v. Copeland (In re Copeland), 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003) (citing Ozburn v.

Moore (In re Moore), 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)). The party seeking to establish an exception to discharge has the burden of proving each of these elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). "A central purpose of the Bankruptcy Code is to give 'honest but unfortunate debtor[s]' a 'fresh start.'" Pazdzierz v. First Am. Title Ins. Co. (In re Pazdzierz), 718 F.3d 582, 586 (6th Cir. 2013) (quoting Grogan, 498 U.S. at 286-87). Therefore, "exceptions to discharge are to be strictly construed against the creditor." Rembert, 141 F.3d at 281.

Additionally, actual fraud as used in § 523(a)(2)(A) is not limited to misrepresentations. Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). "When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." Id.

The basis for Plaintiffs claims are that the Debtor, salespeople, and Mr. Graber knowingly misrepresented that the project with all the amenities would be completed by certain dates and that it was covered by bonds and that Plaintiffs relied on this to their detriment in purchasing the lots. Thus, Plaintiffs' claims are based entirely on fraudulent misrepresentations. Although Plaintiffs have argued that the Debtor was engaged in a scheme to commit actual fraud, the basis for the alleged scheme are misrepresentations and omissions. Thus, Plaintiffs must prove each of the elements by a preponderance of the evidence. Grogan, 498 U.S. at 291.

### b. Material Misrepresentation

The first element that Plaintiffs must prove is that Debtor obtained money or services through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth. 11 U.S.C. § 523(a)(2)(A). The first element requires the Plaintiffs show the following: 1) debtor obtained money, 2) there was a material misrepresentation, 3) the debtor knew the representation was false or was at the very least grossly reckless regarding its truth. Old Republic Title Co. of Tenn. v. Looney (In re Looney), 453 B.R. 252, 259 (B.A.P. 6th Cir. 2011).

A debtor must obtain "money, property, services, or an extension, renewal, or refinancing of credit." § 523(a)(2)(A). Plaintiffs must show that "the debtor directly or indirectly obtained some tangible or intangible financial benefit as a result of his misrepresentation." Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172 (6th Cir. 1996) (finding that debtor obtained money when the misrepresentation infused a corporation that he controlled with $40,000). Here, Debtor obtained a financial benefit through the companies he owned receiving the proceeds of lot sales.

A material misrepresentation is a substantial inaccuracy that would affect a creditor's decision. Lawrence Bank v. Brent (In re Brent), 539 B.R. 788, 799 (Bankr. S.D. Ohio 2015) (quoting In re Copeland, 291 B.R. at 761). Plaintiffs testified that they purchased the lots based on numerous material misrepresentations provided by Debtor and the Sequatchie Pointe sales force. These alleged misrepresentations included that there would be paved roads, water, gas, electric and cable available throughout the development. In addition, amenities of a clubhouse,

riding trails, and equestrian center were promised as part of the sales pitches to Plaintiffs. Timelines for the completion of construction were also represented to Plaintiffs. Salespeople also informed Plaintiffs that Debtor was a wealthy man and that the project was bonded. The website and salespeople also indicated that JJDEI was in a strong cash position and could provide owner financing.

Some of these statements are not misrepresentations as they accurately represented the development project at that point in time. For instance, bonds were taken out for the road construction in Tennessee as required under Tennessee law, but not for the Georgia portion of the project. Debtor prior to the failure of Sequatchie Pointe was a wealthy individual and JJDEI could and did in fact provide owner financing to purchasers at Sequatchie Pointe. These representations were not inaccurate and cannot support a claim under § 523(a)(2)(A).

The only statements that were in fact material misrepresentations are the timelines proposed for the completion of the amenities and utilities and that there were bonds covering the Georgia side of the project. The issue for the purposes of this first element is whether the Debtor or the Sequatchie Pointe sales force knew or were grossly reckless regarding the truth of these statements. Knowing is defined as "'having or showing awareness or understanding' and includes conscious or deliberate acts." Fortman v. Crowe (In re Crowe), No. 13-31450, Adv. No. 13-3092, 2014 WL 4723084, *8 (Bankr. N.D. Ohio Sept. 22, 2014) (quoting In re Copeland, 291 B.R. at 763). The Sixth Circuit has not specifically defined "gross recklessness" for the purposes of § 523(a)(2)(A), but courts have held that a debtor must make the representations with "reckless disregard for, or conscious indifference to, the truth." In re Crowe, 2014 WL 4723084 at *8 (citing In re Copeland, 291 B.R. at 763; Nat'l City Bank v. Manning (In re Manning), 280 B.R. 171, 191 (Bankr. S.D. Ohio 2002); Pearce v. Muncey (In re Muncey), No. 08-51850, Adv. No. 08-5091, 2009 WL 1651451, *5 (Bankr. E.D. Tenn. June 12, 2009)). Recklessness requires a greater degree of fault than mere negligence but does not rise to the level of a deliberate act.

The salespeople's statements regarding the completion of utilities and amenities by certain timelines ended up being inaccurate. However, at the time they were made the Sequatchie Pointe salespeople did not know that they were false. All of the salespeople stated that they would simply pass along the information provided by Mr. Graber and Mr. Smith, their supervisors. Thus, the salespeople had no knowledge of the fact that these timelines would turn out to be inaccurate, and did not act with a conscious indifference to the truth.

Mr. Graber, on the other hand, stated in his deposition that there were financial issues from the outset of the project. Mr. Graber also contends that he was not involved in any sales or provided any timelines for completion. Testimony from Plaintiffs and the salespeople directly contradicts his assertion that he was not involved in sales. Thus, while he believed there were financial issues that would render the project unfeasible, he was providing inaccurate timeframes for completion of the utilities and amenities to salespeople and directly to Plaintiffs. As previously discussed, the court does not find Mr. Graber's testimony to be credible.

The salesforce also represented that Sequatchie Pointe would be completed because there were bonds covering the construction of the roads. This was a true statement for the lots sold in

16

Tennessee, there were bonds securing the construction of the roads. However, for the lots sold in Georgia this was a material misrepresentation. There were no bonds securing the construction of roads or utilities for the Georgia portion of Sequatchie Pointe.

Debtor only had direct contact with twelve of the Plaintiffs. Of those twelve, only Diana and Thomas Graham and Vincent and Mary Alice Augusta testified that Debtor made representations regarding the timelines for completion. According to Mr. Augusta Debtor confirmed that Sequatchie Pointe would be completed in four months. According to Mr. Graham, Debtor was present for the one-year timeline provided by Daryl Smith. In each instance, Debtor confirmed the representations made by the sales person. At the time, Debtor confirmed the salesperson's representations that he believed the project would be completed. Further, Plaintiffs have provided no evidence that Debtor knew at the time of the representation that it was false or that he acted with a gross disregard for the truth. The only evidence is Plaintiffs' testimony that Debtor was present and confirmed the dates. Without more, this is not proof that Debtor was deliberately attempting to mislead. Accordingly, Debtor did not knowingly make any material misrepresentations or act with a conscious indifference to the truth regarding the timelines provided for completion.

Debtor was present and confirmed representations regarding the bonding of the Sequatchie Pointe to Charles and Ellen McAvoy. The McAvoys purchased a lot in Georgia. Debtor knew that the bonds only covered the construction of roads in Marion County, Tennessee. Debtor did not correct or clarify that the bonding provided no assurances for construction in Georgia. Accordingly, Debtor acted with a conscious indifference to the truth regarding the representations to Charles and Ellen McAvoy that there were bonds covering the Georgia portion of Sequatchie Pointe.

The only material misrepresentations that were made with a gross recklessness for the truth of the matter were Mr. Graber's statements regarding the timeline for completion and representations made by Debtor and the salesforce that there were bonds covering construction in Georgia. Regarding all other alleged misrepresentations, Plaintiffs have not satisfied their burden that it was more likely than not that when these representations were made Debtor or the sales force knew them to be untrue, or made them with a gross recklessness for the truth.

### c.  Intent to Defraud

The primary issue in this case is whether or not Debtor possessed the intent to deceive necessary for a finding of nondischargeability. A debtor's intent to defraud a creditor is governed by a subjective standard considering the totality of the circumstances. In re Rembert, 141 F.3d at 281-82. A finding of the necessary intent to support a fraudulent misrepresentation may be based on circumstantial evidence as direct proof of intent will rarely be available. Risk v. Hunter (In re Hunter), 535 B.R. 203, 213 (Bankr. N.D. Ohio 2015).

A debtor intends to defraud a creditor "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance money, goods or services to the debtor." Bernard Lumber Co. v. Patrick (In re Patrick), 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001). "A fraudulent promise under § 523(a)(2)(A) requires proof that at the time the debtor made it, he or she did not intend to perform as required." In re Hunter, 535 B.R.

at 218 (quoting <u>Farina v. Balzano (In re Balzano)</u>, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991)). "If there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." <u>ITT Fin. Servs. v. Szczepanski (In re Szczepanski)</u>, 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

### i. Gross Recklessness is not the Standard for Intent under § 523(a)(2)(A)

Plaintiffs argue even if the court does not find that Debtor intentionally defrauded Plaintiffs in their purchasing of lots at Sequatchie Pointe so long as Debtor was at least grossly reckless that is enough to satisfy the requirements of § 523(a)(2)(A). Plaintiffs are mistaken, "the existence of fraudulent intent under § 523(a)(2)(A) hinges on whether the debtor, at the time the debt in question is incurred, intended to honor the obligation." <u>In re Hunter</u>, 535 B.R. at 213 (citing <u>Clyde-Findlay Area Cr. Union v. Burwell (In re Burwell)</u>, 276 B.R. 851, 854 (Bankr. N.D. Ohio 2002)).

Plaintiffs' reliance on <u>Fortman v. Crowe (In re Crowe)</u>, to support their argument that a Debtor acting with gross recklessness can support the necessary finding of intent is misplaced. No. 13-31450, Adv. No. 13-3092, 2014 WL 4723084 (N.D. Ohio Sept. 22, 2014). Although the court in <u>In re Crowe</u> had a detailed discussion of the definition of gross recklessness it was not regarding the element of intent. <u>Id.</u> at *8. Instead, the court was discussing the element of a misrepresentation that is known to be false or made with a gross recklessness for the truth. <u>Id.</u> The defendant in <u>In re Crowe</u> did not act with gross recklessness. <u>Id.</u> Additionally, the defendant in Crowe did not possess the required intent to support a finding of nondischargeability under § 523(a)(2)(A). <u>Id.</u> at *10.

Proving the element of intent is similar to proving Debtor's knowledge and/or recklessness. <u>In re Copeland</u>, 291 B.R. at 766 ("Proving the Debtor's intent to defraud is similar to proving the Debtor's knowledge and/or recklessness as to the falsity of the representations made."). Generally, if a person is knowingly making a misrepresentation to you their intent at that time is to deceive you. However, the same is not true if the person recklessly makes a misrepresentation. In order to prove the element of intent Plaintiffs must prove that at the time the reckless promise the debtor did not intend to perform. Therefore, not only would a debtor have had to make a representation with a gross recklessness regarding its truth but also would have to intend that the representation deceive Plaintiffs.

### ii. Debtor and the Sequatchie Pointe Sales Force Possessed the Requisite Intent to Defraud

Debtor and the Sequatchie Pointe sales force intended to defraud George Stone, Susan Stone, Charles McAvoy, Ellen McAvoy, Marvin Ferkinhoff and Carol Ferkinhoff. Fraudulent intent is a subjective inquiry into actions of the debtor that requires proof at the time the misrepresentations were made debtor knew of the falsity and did not intend to perform as represented. <u>In re Hunter</u>, 535 B.R. at 218.

Considering the totality of the circumstances, Debtor's actions show fraudulent intent in misrepresenting that the bonds secured the construction of roads in Georgia. Debtor and the salesforce knew that the bonds only covered Marion County, Tennessee. George Stone, Susan Stone, Charles McAvoy, Ellen McAvoy, Marvin Ferkinhoff, and Carol Ferkinhoff, all purchased lots in Georgia and testified that they were told the project was likely to be completed because there were bonds covering the construction. Debtor was present for the sale to Charles and Ellen McAvoy and confirmed that there were bonds. Debtor knowingly made a false representation to the McAvoys knowing that it would induce a sale. See In re Patrick, 265 B.R. at 916. Additionally, the sales force knowingly made the same representation to the Stones and Ferkinhoffs in order to complete a sale. Accordingly, George Stone, Susan Stone, Charles McAvoy, Ellen McAvoy, Marvin Ferkinhoff, and Carol Ferkinhoff have satisfied their burden of proof that the Debtor or the sales force had the intent to deceive them in their purchases of lots in Georgia.

Plaintiffs, on the other hand, did not prove that Debtor possessed fraudulent intent regarding the timelines for completion of the project. Debtor testified that it was always his intent to complete the project and that it was not until ArborOne required one hundred percent of the lot sales in January of 2009 that he realized the project could not be completed. There were no sales after that time. Additionally, all of the salespeople and Mr. Graber also testified that they never intended to mislead any of the purchasers.

Fraudulent intent can be based on circumstantial evidence before and after the allegedly fraudulent statements were made considering the totality of the circumstances. In re Rembert, 141 F.3d at 281-82. Because intent can be shown from circumstantial evidence and a debtor's conduct, fraudulent intent could be inferred by showing that Debtor knew the project was financially impossible but continued selling lots anyway. The gist of Plaintiffs argument is that Debtor must have known that the project was not financially feasible from the beginning because it was not completed. The evidence points to the contrary.

Debtor's actions show the opposite of fraudulent intent. Debtor continued to spend money on the construction of Sequatchie Pointe. Roads and utilities were installed in portions of Sequatchie Pointe. Debtor attempted to refinance the loans in order to secure the required funding to continue the project after ArborOne required all of the sales proceeds. These are all actions that show an intent to complete the project. Debtor put his own money into the project and personally signed for loans that led to his financial demise. These are not the actions of someone that knows the project is hopeless from inception.

Plaintiffs argue that the letters in 2006-2007 from ArborOne regarding the owner equity covenants show that Debtor was in default and not financially able to complete the project from the beginning. Although the letters threatened the possibility of default, Sequatchie Pointe cured the issues to ArborOne's satisfaction. Even after sending the owner equity covenant letters ArborOne continued to provide funding for the Sequatchie Pointe project through the revolving line of credit when lots were sold. Plaintiffs attempt to portray the early defaults as a house on fire. These were routine, technical defaults that are seen all the time. Further, the defaults were cured and the lending relationship continued.

19

It was not until January of 2009 that ArborOne demanded the proceeds of lot sales, effectively ending the funding of the project. There were no sales made after the January 2009 letter. The testimony of Mr. Phillips and Mr. Spivey confirm that ArborOne continued to fund the project until January of 2009. Debtor may have been naïve in taking on a project that involved much greater construction than previous projects but that does not equate intentional misconduct.

The only evidence regarding Debtor's intent to deceive the Plaintiffs based on inacurrate timelines comes from Mr. Graber's testimony. Mr. Graber stated that Debtor told him to run machinery to make it appear construction was being done and told the sales force to use CB radios to call out fake lots sales. Other than these statements there is no evidence that either practice took place. Additionally, Mr. Graber stated that there were financial difficulties that Debtor was aware of from the beginning. The testimony of Mr. Spivey and Mr. Phillips contradicts Mr. Graber's. Both testified that it was not until January of 2009 that funds were no longer available. Mr. Phillips also testified regarding Debtor's attempt to refinance with ArborOne in early 2009 in order to complete the project as planned. As previously stated Mr. Graber's testimony is not credible. Virtually every witness derided his character and the statements appear to be transparent attempts to deflect personal responsibility. Accordingly, these unsupportable allegations are not credible evidence of intent on Debtor's part.

The Sequatchie Pointe sales force also did not possess the intent to defraud the Plaintiffs regarding the timelines for completion of the project. All of salespeople whose testimony was introduced at trial consistently stated that they never intended to mislead the purchasers. The sales force was simply passing on the information they were told by Mr. Graber and Greg Smith. Mr. Graber also stated that he never intentionally misled purchasers at Sequatchie Pointe. Plaintiffs have not introduced any evidence regarding the intent of the Sequatchie Pointe sales force.

The purpose of the bankruptcy code is to give debtors a fresh start. Therefore, exceptions to discharge are strictly construed against the creditors. In re Rembert, 141 F.3d at 281. Considering this mandate and the totality of the circumstances surrounding the representations made to Plaintiffs, this is a case where there is a logical inference of honest intent. In re Szczepanski, 139 B.R. at 844. Accordingly, Debtor did not possess the necessary intent to deceive.

The majority of Plaintiffs' claims are better understood as a claims for breach of contract. Debtor, the sales force, and Mr. Graber made promises regarding the construction at Sequatchie Pointe. The only evidence to support their theory of intentional misrepresentations are that these promises went unfulfilled. However, for the purposes of bankruptcy these unfulfilled promises are not enough to support a claim of nondischargeability under § 523(a)(2)(A). See Heintschel v. Smith (In re Smith), No. 12-34213, Adv. No. 12-3210, 2013 WL 522919, *1 (Bankr. N.D. Ohio Feb. 12, 2013). A subsequent breach of a promise or breach of contract "is not by itself proof that the contract was made with the intent to defraud." Waitman v. Steed (In re Steed), 157 B.R. 355, 358 (Bankr. N.D. Ohio 1993). Mr. Graber's directions to the sales force regarding the timelines told to Plaintiffs is exactly this type of unfulfilled promise. The fact that the

representations regarding timelines and construction never came true, absent more, is not an actionable fraudulent misrepresentation.

### d. Justifiable Reliance

The Supreme Court has determined that the justifiable reliance standard that Congress intended to adopt for purposes of § 523(a)(2)(A) was the common law understanding of justifiable reliance as articulated by the Restatement (Second) of Torts. Field v. Mans, 516 U.S. 59, 71 (1995). According to this standard, justifiable reliance "'is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which would serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" Id. (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).

The justifiable reliance standard is subjective, and involves an examination of the sophistication of the creditor and the individual circumstances surrounding the debt. Frost & Co., Inc., v. Smithey (In re Smith), 474 B.R. 830, 838 (Bankr. N.D. Ohio 2012). "This means that a party may justifiably rely on a misrepresentation even when the falsity of the representation could have been ascertained by an investigation." Id. However, "reliance is not justifiable if the creditor blindly turns their eyes away from things which would have clearly shown that any reliance on debtor's misrepresentation was misplace." Id. at 838-39.

The only intentional misrepresentations in the present matter are the Debtor's and sales forces' statements to Georgia purchasers that the project was bonded. George Stone, Susan Stone, Charles McAvoy, Ellen McAvoy, Marvin Ferinkhoff, and Carol Ferkinhoff all testified that they relied on the representation regarding bonding when deciding to purchase their lots.

Debtor argues that Plaintiffs' reliance on any representations is unjustifiable because of the statements in the HUD report. Plaintiffs counter that the HUD reports did not meet the standards outlined in the Code of Federal Regulations and were not accurate enough to provide Plaintiffs with notice of the risks associated with buying undeveloped land.

Plaintiffs were not sophisticated purchasers of raw land. Most had previously purchased homes and a few had worked in the real estate industry. The HUD report included estimated dates for the completion of roads, utilities, and amenities planned at Sequatchie Pointe. The HUD report also included clear language that there were no financial assurance of completion of the project. However, the HUD reports provided did not provide all the necessary information as required by the Code of Federal Regulations governing their creation. See 24 C.F.R. §§ 1710.209(f)(3); 210; 212(b) (2007). George Stone, Susan Stone, Marvin Ferkinhoff and Carol Ferkinhoff signed a receipt stating that they received and reviewed the HUD property report. Charles and Ellen McAvoy did not recall receiving the HUD report and there is no receipt for them in evidence.

Based on all the circumstances at closing there was not enough warning for Plaintiffs to investigate further. The presence of the incomplete HUD reports as part of the closing documents is not enough to make otherwise justified reliance unjustifiable. Accordingly, George Stone,

Susan Stone, Charles McAvoy, Ellen McAvoy, Marvin Ferinkhoff, and Carol Ferkinhoff reliance on the misrepresentation that the bonds covered the Georgia lots was justified.

### e. Imputed Fraud and 11 U.S.C. § 523(a)(2)(A)

This adversary proceeding is part of Debtor's personal bankruptcy. Debtor was only involved in sales to twelve Plaintiffs.[3] He was not even in the state (Tennessee or Florida) when most sales were concluded. Plaintiffs who had no direct contact with Debtor must therefore show that Debtor is legally culpable for the fraud of a third-party. Plaintiffs argue that any fraud perpetrated by the Sequatchie Pointe sales force is automatically imputed to Debtor because of the agent-principal relationship.

The issue before the court is, in the instances where the sales force committed intentional fraudulent misrepresentations, but Debtor was not directly involved in the sale, could the sale person's fraud be imputed to Debtor for the purposes of § 523(a)(2)(A). This is a matter of first impression for this court. The Sixth Circuit Court of Appeals has not determined whether the fraud committed by an agent/employee can be imputed to a debtor/principal.

The Sixth Circuit Court of Appeals, in a case involving a partnership, held that fraud can be imputed to an innocent partner who received a financial benefit from the fraud of another partner. BancBoston Mortg. Corp. v. Ledford (In re Ledford), 970 F.2d 1556 (6th Cir. 1992) cert. denied, 507 U.S. 916 (1993). This approach adopted by the Sixth Circuit is considered the "receipt of benefits" approach. Id. at 1561-62. In In re Ledford, the debtors were general partners in a venture to build condominium. Id. at 1558. Financing for the project was contingent on providing the creditor with a set number of valid purchase contracts. Id. One of the partners submitted the required number, but several were signed by parties who had no intention of purchasing. Id. Although only one partner committed the fraud the court held that because the innocent partner shared in the monetary benefit of the fraud the fraud can be imputed to him for the purposes of § 523(a)(2)(A). Id. at 1561. It would be quite a leap however, to analogize the imputed liability of general partners to a situation involving a corporation. Would we impute any fraud committed by a salesman of a large bank to all of the bank's officers and shareholders? This is highly unlikely.

Courts have struggled with the issue of whether the fraud of one party can be imputed to an otherwise innocent debtor. Much of the confusion and different approaches arises because of two pre-bankruptcy code Supreme court cases, both of which are still good law. Strang v. Bradner, 114 U.S. 555 (1885) (holding that debts of innocent partners are not dischargeable); Neal v. Clark, 95 U.S 704 (1877) (holding that fraud means positive fraud and not imputed fraud or fraud at law). The competing holdings have led to multiple approaches for analyzing imputed fraud in dischargeability cases.

Attempting to reconcile this Supreme Court precedent and the modern understanding of the purpose of the bankruptcy code, courts have developed different approaches to the issue of

---

[3] The following Plaintiffs testified that they had direct contact with Debtor regarding the purchase of their property: Robert and Lisa Allen, Vincent and Mary Augusta, Mary Olivias, Flora Real, Charles and Ellen McAvoy, Joseph and Diane Schmid, Diana and Thomas Graham.

imputed fraud. One approach, is to generally deny discharge in all cases. Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.), 239 F.3d 746, 751 (5th Cir. 2001) (holding that innocent partners are precluded from discharging debts created by partner's fraud even if they did not benefit from the fraud). A second approach is to deny discharge only if the debtor benefitted from the fraud. Luce v. First Equip Leasing Corp. (In re Luce), 960 F.2d 1277 (5th Cir. 1992) (distinguished in Winkler 239 F.3d at 749-51); In re Ledford, 970 F.2d 1556. The third approach is to deny discharge only if the subject knew or should have known about the fraud. Walker v. Citizens State Bank of Maryville, Mo. (In re Walker), 726 F.2d 452, 454 (8th Cir. 1984).

On the other hand, Plaintiffs argue that bankruptcy courts must look to state-law regarding any agency liability issues under § 523(a)(2)(A). Kodz v. Trotter (In re Trotter), No. 312-90232, Adv. No. 312-90232, 2013 WL 3013339, *4 (Bankr. M.D. Tenn. June 17, 2013). In In re Trotter, the owner of an auction house was held liable for the fraudulent misrepresentations of one of his employees under § 523(a)(2)(A). Id. at *6. The court held that a debtor is liable, even if they did not make any representations, as long as the debtor is liable for fraud under the applicable state law. Id. at *4. Under Tennessee agency law, principals who accept benefits gained through fraud are liable for the fraudulent representations of their agents. Id.

In Sachan v. Huh (In re Huh), the Ninth Circuit Court of Appeals adopted the standard applied in In re Walker. 506 B.R. 257, 272 (9th Cir. 2014). The court held that an agent's fraud may only be imputed for the purpose of discharge exception under § 523(a)(2)(A) if there is some proof that the debtor is culpable, that is, that the debtor "knew or should have known" of the agent's fraud, though the debtor need not have participated actively in the fraud. Id. at 266. The Ninth Circuit reasoned that because courts are to interpret the Bankruptcy Code narrowly in favor of the debtor and against creditors the "knew or should have known" standard is appropriate. Id. at 272.

In re Huh is factually similar to the present matter. The debtor was the owner of a real estate business. Id. at 259. One of the debtor's agents made a sale without the debtor's knowledge or involvement. Id. at 260. The agent made intentional misrepresentations regarding defects on the property and the amount of sales it would generate. Id. The creditors sued in state court and the state court held the debtor vicarious liable for his agent's fraud. Id. at 272. The Ninth Circuit affirmed the bankruptcy court's ruling that debtor was not liable though, because he was not involved or aware of the sale. Id.

The court believes that the modern approach to the Bankruptcy Code which prioritizes a debtor's second chance precludes simply applying state law to issues of dischargeability and imputed fraud under § 523(a)(2)(A). An approach that is more consistent with the goals of the bankruptcy code requires some level of culpability on the part of a debtor as an innocent debtor should be able to take advantage of the protections of the bankruptcy code. Accordingly, the court finds that a debtor is not automatically vicariously liable for the actions of his agents.

In order for the fraud of any employees/agents to be imputed to Debtor Plaintiffs would have to show that Debtor knew or should have known about the fraud. Here, Debtor was actively involved in misrepresenting to Charles and Ellen McAvoy that bonds covered the road

construction in Georgia just as in Tennessee. Debtor was present and did not correct the salesperson making this misrepresentation. Thus, Debtor knew that the salesforce was misrepresenting that bonds covered property in Georgia and did not correct this inaccuracy. Plaintiffs have shown that Debtor's culpability by personal participating in this misrepresentation to the McAvoys and not correcting it. Accordingly, Debtor is personally liable through the theory of imputed fraud for the misrepresentations regarding bonds made to George Stone, Susan Stone, Marvin Ferkinhoff and Carol Ferkinhoff.

For the majority of Plaintiffs this case is independently decided by Debtor's lack of knowledge. Debtor did not recognize his limitations. The project was ultimately derailed by Debtor's inability to get a road across a particular point near the bottom of the mountain. If you cannot get past the bottom of the mountain, you cannot get to any other place on the mountain.

Debtor never adequately perceived the effect of his lack of experience in this area, and several others, that bedeviled the project and still bedevil it today. He preferred to view himself as a victim which, although emotionally convenient is not borne out by the facts. And yet, his absence of introspective analysis of his abilities is not so profound as to rise to a level in which assumptions, inferences, and imputations arise to doom his case.

Although it is tempting to apply *sub rosa* justifications for holding against the true state of the facts, this is not acceptable in the American legal system. Similarly, where options exist in standards to be applied, the differing levels of sympathy we feel toward the parties should not enter the analysis. This would leave us stuck with choices that may not fit the sympathies of subsequent cases and institutionalize inappropriate standards.

## VI.    Stay of Damage Award is not Warranted

Debtor filed a pretrial motion to stay any potential damage award until the resolution of the Tennessee bond litigation. Plaintiffs object, arguing that the Tennessee bond litigation has no bearing on the outcome of this litigation. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants." Landis v. North American Co., 299 U.S. 248, 254 (1936); see also Fed. Trade Comm. V. E.M.A. Nationwide, Inc., 767 F.3d 611, 626-27 (6th Cir. 2014); Ohio Envtl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div., 565 F.2d 393, 396 (6th Cir. 1977). The "burden is on the party seeking the stay to show that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." Ohio Envtl. Council, 565 F.2d at 396.

A stay of the damage award is not warranted. Plaintiffs have not meet their burden of showing a pressing need for a stay. This adversary proceeding commenced in 2009 and has been pending more than seven years. Additionally, judicial economy is not served by a stay as it would require additional proceedings and rulings in this court. Finally, and most crucially, the bond litigation will not impact the damages awarded by this court. Only Plaintiffs who purchased in Georgia based on the misrepresentation that the bonds covered the entire project were successful in proving their claims. The bonds are only securing infrastructure improvements in Marion County, Tennessee. Thus, the potential benefit of the bond litigation

freeing up capital for infrastructure construction in Tennessee will not directly affect the Georgia purchasers. Accordingly, a stay of damage award is not warranted because any Tennessee court decision will not materially affect the successful Plaintiffs amount of damage.

## VII.     Damages

The next issue the court must address is the proper measure of damages for those Georgia Plaintiffs who successfully proved their claims. Plaintiffs claim that the proper measure is the benefit of the bargain rule. Defendant counters that 1) the benefit of the bargain rule does not apply; and 2) Plaintiffs did not provide sufficient evidence for the value of the lots at the time of purchase to prove their damages.

Here the parties have consented to the bankruptcy court's adjudication of liability of the creditor's claims and the awarding of damages thereon. Wellness, 135 S. Ct. at 1939; see also Longo v. McLaren (In re McLaren), 3 F.3d 958, 965-66 (6th Cir. 1993) (holding that bankruptcy courts have jurisdiction to determine damage awards.). The court will look to state law for the appropriate measure of damages. Haney v. Copeland (In re Copeland), 291 B.R. 740, 792 (Bankr. E.D. Tenn. 2003).[4]

Tennessee recognizes the benefit of the bargain rule as the appropriate measure of damages in fraudulent misrepresentation cases. Haynes v. Cumberland Builders, Inc., 546 S.W.2d 228, 233 (Tenn. Ct. App. 1976). The benefit of the bargain measures the difference between: the actual value of the property that the purchaser received and the value of the property would have had but for the misrepresentation. Knot v. Wilson (In re Wilson), 12 B.R. 363, 370 (Bankr. M.D. Tenn. 1981) (applying benefit-of-the-bargain rule to claims under § 523(a)(2)(A)); see also Haynes, 546 S.W.2d at 233. The value the property would have had is often measured by the contract price between the two parties. Haynes, 546 S.W.2d at 234. The actual value of the property is determined as of the time of the transaction. Id. The proper measure of the Plaintiffs damages is the difference between the actual value at the time of purchase and the value the Plaintiffs paid for their Georgia lots.

The benefit of the bargain is the proper measure of damages in the present matter. Relying on Elchlepp v. Hatfield, Debtor argues that the rule only applies to misrepresentations of then-present physical characteristics of the property. 294 S.W.3d 146, 152 (Tenn. App. 2008). Debtor's assertion is incorrect and unsupported by Elchlepp. Id. Elchlepp does not support this assertion. Id. Instead, the court was simply clarifying that the value of the property is to be determined at the time of the transaction. Id.

Debtor also argues that Plaintiffs did not introduce enough evidence to prove the actual value of the lots at the time of purchase. Here, two transactions provide the valuations for the land when it was purchased and the land if it had been covered by bonds and developed as planned. Debtor purchased 6,756 acres of land for $10,809,600.00. Thus, the value of undeveloped land at Sequatchie Pointe is $1,600 per acre. Plaintiffs testified that at the time of

---

[4] As discussed in previous rulings in this matter, Tennessee state law applies to any state law fraud issues. Sequatchie Mountain Creditors v. Detweiler (In re Detweiler), No. 09-63377, Adv. No. 09-6118, 2016 WL 321037, *5 (Bankr. N.D. Ohio January 25, 2016).

purchase there were no actual roads or any construction done in Georgia. A number of Plaintiffs had to hike to their lots in order to view them. The Georgia lots were in essentially the same state as when Debtor purchased the land. Accordingly, the purchase price paid by Debtor and the purchase price paid by the Plaintiffs are the best measurements of the value the property would have had but for the misrepresentation and the current value of the land.

George and Susan Stone, Charles and Ellen McAvoy, and Marvin and Carol Ferkinhoff proved their claims under section 523(a)(2)(A). [5] The measure of the damages is the purchase price paid by the Plaintiffs minus the actual value of the land at the time of purchase. The best measure of the land at the time of purchase is the value paid for the raw land. The following chart explains the damage calculation for each of the successful Plaintiffs using the benefit of the bargain theory.

| Plaintiff | Lot(s) | Acres | Purchase Price | Actual Value | Damages Amount |
|---|---|---|---|---|---|
| George and Susan Stone | Georgia 37; 41 | 2.46; 2.61 | $29,000; $34,000 | $3,936; $4,176 | $54,888 |
| Marvin and Carol Ferkinhoff | Georgia 77 | 2.38 | $54,900 | $3,808 | $51,092 |
| Charles and Ellen McAvoy | Georgia 35 | 1.72 | $39,900 | $2,652 | $37,248 |

Plaintiffs also seek pre-judgment interest. The awarding of pre-judgment interest is within the discretion of the trial court. Rybarczyk v. TRW, Inc., 235 F.3d 975, 985 (6th Cir. 2000) (holding that under federal law, the awarding of pre-judgment interest is within the discretion of the trial court); see also Rafoth v. Bailey (In re Baker & Getty Fin. Servs., Inc.), 88 B.R. 792, 800 (Bankr. N.D. Ohio 1988). "Awards of prejudgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole." Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 818 (9th Cir.1994) (quoting Purcell v. United States, 1 F.3d 932, 942043 (9th Cir. 1993)); see also Bergquist v. Anderson– Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1281 (8th Cir. 1988). Pre-judgment interest accrues, at the federal rate provided in 28 U.S.C. § 1961, from the earlier of the date of demand or the date that the adversary proceeding commenced. McDonald v. Morgan (In re Morgan), 415 B.R. 644, 652 (Bankr. E.D. Tenn. 2009) (citing Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.), 124 B.R. 984, 1006 (Bankr .S.D. Ohio 1990)).

Here, pre-judgment interest is warranted. The current litigation has spanned over seven years. In order to make the Plaintiffs whole and in consideration of the length of time this

---

[5] Because of Debtor's death, there is no discharge in the main bankruptcy case. The lack of a discharge and the unique nature of this adversary proceeding results in these successful Plaintiffs likely collecting no more than would have been available in a state court breach of contract case. All Plaintiffs retain breach of contract claims, which may be relevant in the absence of a discharge to the extent assets may be available or recoverable.

proceeding has last the court will grant pre-judgment interest from the date of the filing of the adversary proceeding at the rate provided in 28 U.S.C. § 1961.

CONCLUSION

Plaintiffs have satisfied their burden of showing by a preponderance of the evidence that Debtor's is liable under 11 U.S.C. § 523(a)(2)(A) on George Stone, Susan Stone, Charles McAvoy, Ellen McAvoy, Marvin Ferinkhoff, and Carol Ferkinhoff's claims. Accordingly, the court **GRANTS** judgment in favor of George Stone, Susan Stone, Charles McAvoy, Ellen McAvoy, Marvin Ferinkhoff, and Carol Ferkinhoff under 11 U.S.C. § 523(a)(2)(A). The court **GRANTS** judgment in favor of the Defendant on all other claims. Additionally, the court **DENIES** the Defendant's Motion to Stay any Damage Award. The court **GRANTS** Plaintiffs' Motion to Substitute Jennifer L. Lile, executor and representative of the Estate of Joseph Detweiler, as Defendant in this adversary proceeding. The court **DISMISSES** the Debtor's bankruptcy case. Four separate orders will be entered simultaneously with this opinion.

It is so ordered.

# # #

**Service List**:

**Peter G. Tsarnas**
Goldman & Rosen, Ltd.
11 South Forge Street
Akron, OH 44304

**Jeremy M. Cothern**
Berke, Berke & Berke
420 Frazier Avenue
P.O. Box 4747
Chattanooga, TN 37405

**Anthony J DeGirolamo**
3930 Fulton Drive NW, Suite 100B
Canton, OH 44718
330-305-9700

**Scott M Zurakowski**
PO Box 36963
4775 Munson St NW
Canton, OH 44735-6963

**Stephan R. Wright**
Fleissner, Davis and Johnson
600 Georgia Avenue

Chattanooga, TN 37402