UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| JOSEPH J. DETWEILER, ) | |
| ) | |
| Debtor. ) | |
| _____ ) | Chapter: 11 |
| ) | |
| SEQUATCHIE MOUNTAIN ) | Case Number: 09-63377 |
| CREDITORS, ) | |
| ) | Adversary Number: 09-6118 |
| Plaintiff, ) | |
| ) | Judge: Russ Kendig |
| v. ) | |
| ) | |
| JOSEPH J. DETWEILER, ) | |
| ) | |
| Defendant. ) | |

## MOTION TO ALTER OR AMEND JUDGMENT

Comes now Plaintiffs[1], by and through counsel, and hereby respectfully move this court to Alter or Amend its Judgment issued February 16, 2017, pursuant to Bankruptcy Rules of Federal Procedure 9023 and 8002. Plaintiff respectfully makes this motion on two grounds. First, Plaintiffs assert the Court ignored critical facts in its decision. Second, the Court has relied upon contradictory authority and thus reached contradictory conclusions on the issue of agency/imputed liability.

In brief, key facts that are not discussed in the Court's opinion include:

---

[1] Plaintiffs move for the alteration or amendment of the judgment for all Plaintiffs except George and Susan Stone, Marvin and Carol Ferkinhoff, and Charles and Ellen McAvoy.

1. Detweiler said he knew the project would fail when he received a letter requesting 100% of the lot sales proceeds. The letter was sent and received on either May 16 or 17 of 2007. <u>Exhibit 1</u>, ArborOne Communication. Detweiler never changed his testimony on this point.
2. By all accounts, Detweiler was in complete control of the project.
3. Detweiler said he knew false representations were being made about construction deadlines.
4. Ervin Moore was fired for objecting to the practice of misleading buyers.

These facts, considered in conjunction with the testimony of the Plaintiffs, demonstrates that making material misrepresentations was part of the sales tactic and that, despite Detweiler understanding that the project would fail, he continued to market it as a succeeding development. Even with no weight given to the testimony of Dan Graber, the testimony of Detweiler, Ervin Moore, and the Plaintiffs demonstrate the material misrepresentations that induced the Plaintiffs to purchase land.

A small group of Plaintiffs (listed in Footnote 1) were successful in their claim against the Debtor. The remainder of the Plaintiffs, as the Court found, did not receive misrepresentations directly from the Debtor and therefore could not recover. *See Generally* Doc 341, Memorandum of Opinion. This distinction makes the agency liability or imputed liability between the Debtor and his sales staff critical to the holding against the majority of the Plaintiffs. The standard articulated by the Court at summary judgment stage changed from Tennessee law to 6th Circuit law without explanation and to the detriment of the majority of the Plaintiffs.

## I. Summary Judgment Holdings and Final Opinion

### a. Tennessee Selected in the Choice-of-Law Analysis

At the Summary Judgment stage, this Court considered whether to apply Tennessee or Ohio law to the Plaintiff's claims of fraud and agency. Doc. 246, p. 9. Using the Restatement (Second) of Conflicts of Law §§ 148 and 291 to, respectively, find that Tennessee law applies to the Plaintiffs' fraud claims and to the agency analysis. *Id*.

The issues in this case involve matters of fraud, misrepresentation, agency, and shareholder liability arising under state law. In actions involving fraud or misrepresentation Restatement (Second) Conflicts of Law § 148 (Am. Law Inst. 1971) governs, it states:

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

*Id*. Almost all of the allegations of fraud and misrepresentations from the Plaintiffs took place in Tennessee. The sales were conducted in Tennessee, with buyers traveling to Sequatchie Pointe, taken on a tour and often signing the purchase agreements while at Sequatchie Pointe. Plaintiffs' allegations are that Debtor or his agents made fraudulent representations that induced the buyers to purchase lots during these sales trips. Accordingly, Tennessee law controls the fraud claims.

> The Restatement (Second) Conflicts of Law § 291 governs conflict of laws for agency, it states:
> The rights and duties of a principal and agent toward each other are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties

> and the transaction under the principles stated in § 6.
>
> *Id*. In this case, the state with the most significant relationship to the party's transaction is Tennessee. The vast majority of the project took place in Tennessee, the majority of the construction was in Tennessee, the sales took place primarily in Tennessee and the land in dispute is located in Tennessee. Therefore, the Court will apply Tennessee agency law.

Doc. 246, Memorandum Opinion on Summary Judgment, p. 6.

    b. <u>Debtor Can be Held Individually Liable for the Tortious Acts of His Agents</u>

Following the choice-of-law analysis, the Court, using Tennessee law, found that the Debtor can be found liable for his tortious acts or the tortious acts of his agents, noting this to be true for in Tennessee, Ohio, and in Bankruptcy holdings:

> Under both Ohio and Tennessee law officers can be held liable for their own tortious conduct and the conduct of their agents. <u>Kodz v. Trotter (In re Trotter)</u>, No. 312-00612, Adv. No. 312-90232, 2013 WL 3013339, *4 (Bankr. M.D. Tenn. June 17, 2013); <u>Yo-Can, Inc. v. The Yogurt Exchange, Inc.</u>, 778 N.E.2d 80, 91 (Ohio Ct. App. 2002); <u>Brungard v. Caprice Records, Inc.</u>, 608 S.W.2d 585, 590-91 (Tenn. Ct. App. 1980).

Doc. 246, Memorandum Opinion on Summary Judgment, p 13. The opinion continues by clarifying that the debtor can be held personally liable for the fraudulent misrepresentations of the sales staff even without instructing the staff to do so:

> Under Tennessee agency law a debtor can be personally liable for any fraudulent misrepresentations made by his sales representatives. <u>In re Trotter</u>, 2013 WL 3013339 at *4. "An agency relationship does not require an explicit agreement, contract, or understanding between the parties." <u>White v. Revco Discount Drug Centers, Inc.</u>, 33 S.W.3d 713, 723 (Tenn. 2000). A principle may be held liable for an agent's tortious conduct even without directing or having knowledge of the conduct so long as the "agent was acting in the business of his superior." Id. at 724 (quoting <u>Kinnard v. Rock City Const. Co.</u>, 286 S.W2d 352, 354 (Tenn. 1955)). Here, the parties do not dispute that the salesforce were acting as Debtor's agents.

Doc. 246, Memorandum Opinion on Summary Judgment, p. 14. In this case, we have no dispute that the sales staffers were the Debtor's agents. Evidence has also shown that, in making the sales of the lots (which puts them in the scope of "acting in the business of the superior"), the sales staff

fraudulently mislead the Plaintiffs regarding the completion of various construction deadlines. Doc. 246, Memorandum Opinion on Summary Judgment, p. 14.

Detweiler himself admits that he knew false timelines were given to potential purchasers, specifying that the false information regarded "dates that things would be done." (Detweiler Dep., p. 74 ll. 9-17). These included items such as the clubhouse construction, riding trails installation, building of the roadways, etc., in order to entice the purchase of the lots by the plaintiffs, and were thus set the crux of the fraud itself. Detweiler, while knowing false representations were being made, took no corrective action, even though he undeniably had the authority to do so.

By all accounts, Detweiler was the person in charge. (McDonald Dep., 22:4–19;25:20–25; Smith Dep., 60:18 – 61:6; Olinger Dep., 83:10 – 12; Fetzner Dep., 30:8 – 13; Detweiler Dep., 27:6 – 23; 30:16 – 18; Graber Dep., 14:9 – 12). Detweiler had control over the hiring and firing,[2] he approved all the advertising,[3] he released funds to the project manager for development costs,[4] would have to be the one to authorize payments,[5] and he selected the contractor for the road.[6] Detweiler developed the approximate cost for the completion of the project and set the prices for the lots, and delegated to the managers to execute that plan. (Detweiler Dep., 45: 19 – 46:3). Detweiler was the only one signing the closing documents at the Sequatchie Point development. (Detweiler Dep., 95:6 – 10). Detweiler set rules regarding the prices for the lots, giving salesmen small amounts of leeway, which he conveyed to the salesmen through the sales manager. (Detweiler Dep., 95:18 – 24). Detweiler "…has the final say so, as far as the boss, the one in

---

[2] McDonald Dep., 22:4 – 19.
[3] Fetzner Dep., 30:8 – 13; Detweiler Dep., 45:14 – 18; 83:23 – 84:1.
[4] Graber Dep., 22:5 – 12.
[5] McDonald Dep., 46:5 – 7.
[6] Graber Dep., 32:16 – 23.

control, as far as has all the control, basically, yes." (McDonald Dep., 60:20 – 25). McDonald describes Detweiler as a "control person." (McDonald Dep., 62:1 – 4).

Ervin Moore, one salesman, even testified about a sales meeting where the staff spoke openly about misrepresenting information to the clients. Moore attended a meeting where the sales team was discussing dates for the completion of the infrastructure and what dates the salesmen should be relaying to the clients. (Moore Dep., 32: 3 – 24:10; 102:14 – 103:22). Initially, Moore believed the completion dates were overly ambitious, and so he saw those dates change a number of times. (Moore Dep., 104:2 – 24). At the meeting, when the question of what dates should be given to the buyers, Graber and Brad Watson told the sales team to "make something up," "lie to them," and "tell them whatever they want to hear." (*Id*.). The sales group laughed at practice of lying to the clients, but Moore was upset at the unethical nature of the exchange. (*Id*.). Moore questioned the decision, speaking up and asking the sales leadership if they understood exactly what they were asking the sales team to do – to lie. (Moore Dep., 106:4 – 107:1). Moore's vivid recollection of the sales meeting did not include any member of the group agreeing with him. (*Id*.). Moore stated that "what [they] were telling us to do is were telling us to lie and, you know, create a date to make someone happy, mislead them. And I wasn't about to – I wasn't about to do that." (*Id*.). The very next day, Moore was fired. (*Id*.).

Moore's unwillingness to engage in this fraudulent behavior almost immediately lead to his termination from the project. Clearly, misrepresenting facts to the potential purchasers was a requisite for employment.

    c. <u>Final Opinion and the Changes in Legal Standard</u>

In the Memorandum Opinion, the Court abandoned their prior holding of applying Tennessee law to the allegations of fraud and agency theory that the Plaintiffs had asserted.

> On the other hand, Plaintiffs argue that bankruptcy courts must look to state-law regarding any agency liability issues under § 523(a)(2)(A). Kodz v. Trotter (In re Trotter), No. 312-90232, Adv. No. 312-90232, 2013 WL 3013339, *4 (Bankr. M.D. Tenn. June 17, 2013). In In re Trotter, the owner of an auction house was held liable for the fraudulent misrepresentations of one of his employees under § 523(a)(2)(A). Id. at *6. The court held that a debtor is liable, even if they did not make any representations, as long as the debtor is liable for fraud under the applicable state law. Id. at *4. Under Tennessee agency law, principals who accept benefits gained through fraud are liable for the fraudulent representations of their agents. Id.
>
> In Sachan v. Huh (In re Huh), the Ninth Circuit Court of Appeals adopted the standard applied in In re Walker. 506 B.R. 257, 272 (9th Cir. 2014). The court held that an agent's fraud may only be imputed for the purpose of discharge exception under § 523(a)(2)(A) if there is some proof that the debtor is culpable, that is, that the debtor "knew or should have known" of the agent's fraud, though the debtor need not have participated actively in the fraud. Id. at 266. The Ninth Circuit reasoned that because courts are to interpret the Bankruptcy Code narrowly in favor of the debtor and against creditors the "knew or should have known" standard is appropriate. Id. at 272.

Doc. 341, Memorandum Opinion, p. 23. Plaintiffs assert that the Court should have continued with the standard argued by Plaintiffs and articulated by the Court in the Summary Judgment opinion. Plaintiffs respectfully assert it was error by the Court to change the law used to analyze this case post-trial, and Tennessee law should govern the ruling. The above paragraph states that the Plaintiffs argued for use of Tennessee law, but does not resolve why it was not used.

The Court analogized the instant case to In re Huh which is distinguishable from the instant case on two pivotal points. In In re Huh, as the Court notes, the debtor "was not liable though, because he was not involved or aware of the sale." Doc. 341, p. 23 (*citing* In re Huh, 506 B.R. at 272). The Debtor in this case was involved in and aware of every sale. Any sale below listing price required his personal consent and he signed each and every contract. Detweiler was clearly aware of the sales, and as quoted above, he was aware false deadlines were given by his agents.

    d. <u>Debtor Knew or Should Have Known the Project was Inviable</u>

Even using the standard under In re Huh, the Court should be able to find that the Defendant "knew or should have known" about the lack of financial viability of the project and impossibility

to the construction deadlines given by the sales staff. Most importantly, Detweiler admitted that he knew the project was over when he received the letter communicating that 100% of each purchase price would need to be paid to the bank, leaving him no funds to accomplish the project buildout. In a May 17, 2007 email, with an attached letter from May 16, 2007, states that ArborOne will "now also be requiring 100% of the sales price of all lot sales before releasing the land." <u>Exhibit 1</u>, ArborOne Correspondence. When asked when he knew "that [he] wouldn't be able to complete the Sequatchie Pointe project," Detweiler responds by saying "[w]hen they sent me a letter and said they wanted 100 percent of the funds, I knew it was over with." (Detweiler Dep., 98:8 – 11). Clearly, Detweiler sold many lots with the belief that the project would never reach completion. Once Detweiler received the letter, simply marketing the land as anything other than raw, undeveloped property is a material misrepresentation. The continued sales efforts, which Detweiler controlled, are misrepresentations when Detweiler knew the project would fail.

The lack of itemized budgeting is a glaring mistake that should have lead the Debtor to know the project would be ultimately underfunded. Russel Phillips, an accountant hired by J.J. Detweiler and Detweiler, individually, in December of 2008, believes that Detweiler was in "over his head, out of his comfort zone at Sequatchie Point…he was not prepared to or experienced to – to complete [necessary infrastructure]." (Phillips Dep., 27:4 – 11).

Additionally, Debtor's daughter, previously a forty-nine percent (49%) owner in the development, left the project for zero dollars. (McDonald Dep., 34:4 – 18). Sequatchie Point was a larger project, from a cost and construction perspective, that Detweiler had ever done which led Cheryl McDonald to believe there would be liability exposure if she remained an owner. (McDonald Dep., 36:6 – 21). This, again, evidences the lack of financial viability in the project by demonstrating that two parties agreed that the ownership in the development was valueless. The

market value of forty-nine percent of the development was deemed to be zero dollars, as negotiated by two parties, providing evidence that the Debtor knew the project would not be successful.

## II.     Conclusion

For the reasons stated above, the Plaintiffs, who did not prevail on their claims, respectfully request this Court alter or amend its judgment to include the relevant facts articulated herein and during trial, apply those facts to the legal standard established at the Summary Judgment stage, and that this Court enter a judgment for each of the Plaintiffs in the amount that they have proved.

Respectfully submitted,

/s/ Peter G. Tsarnas
Peter G. Tsarnas, #0076934
Goldman & Rosen, Ltd.
11 South Forge Street
Akron, OH  44304
(330) 255-0735 - Telephone
(330) 315-7542 - Fax
ptsarnas@goldman-rosen.com
Attorney for Plaintiff

and

/s/ Charles A. Flynn
Charles A. Flynn (BPR #30878)
Berke, Berke & Berke
420 Frazier Avenue
Post Office Box 4747
Chattanooga, Tennessee 37405
(423) 266-5171 - Telephone
(423) 265-5307 – Fax
chuck@berkeattys.com
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, certify that on this 2nd day of March, 2017, a true and correct copy of the *Motion to Alter or Amend* was served:

Via the Court's Electronic Case Filing System on these entities and individuals who are listed on the Court's Electronic Mail Notice List:

- Aletha M. Carver acarver@kwgd.com, mhelmick@kwgd.com
- Anthony J DeGirolamo ajdlaw@sbcglobal.net, amber_weaver@sbcglobal.net;sedlaw@sbcglobal.net;G23630@notify.cincompass.com
- Valerie W. Epstein vepstein@epsteinlawfirm.net, afinney@epsteinlawfirm.net
- Matthew W. Onest monest@kwgd.com, mhelmick@kwgd.com
- Joseph J Pasquarella jpasquarella@kwgd.com, mhelmick@kwgd.com
- United States Trustee (Registered address)@usdoj.gov
- Peter G. Tsarnas ptsarnas@goldman-rosen.com, tsarnasp@hotmail.com;debm@goldman-rosen.com
- Peter G. Tsarnas ptsarnas@goldman-rosen.com, tsarnasp@hotmail.com;debm@goldman-rosen.com
- Stephan R. Wright swright@fleissnerfirm.com, srwright10@gmail.com
- Scott M Zurakowski szurakowski@kwgd.com, mhelmick@kwgd.com

And by regular U.S. mail, postage prepaid, on:

Marvin B. Berke, Berke, Berke & Berke, 420 Frazier Avenue, Chattanooga, TN 37405

Jennifer L. Lile, 4775 Munson St. NW, Canton, Ohio 44718

/s/ Peter G. Tsarnas
Peter G. Tsarnas, #0076934